# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AMERICAN CIVIL LIBERTIES UNION, ) | |
| ) | |
| AMERICAN CIVIL LIBERTIES UNION ) | |
| FOUNDATION, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | No. 1:20-cv-02320 (RBW) |
| ) | |
| FEDERAL BUREAU OF PRISONS, ) | |
| ) | |
| *Defendant.* ) | |
| _____ ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY.........................................................3

1.  The Trump Administration's Decision to Restart Executions During the COVID-19
    Pandemic and the Fall 2020 Elections ........................................................................3

2.  The ACLU's FOIA Requests and the Subsequent History.........................................10

LEGAL STANDARD.......................................................................................................13

ARGUMENT ....................................................................................................................15

I.    Many of BOP's Factual Assertions Are Not Supported by Admissible Evidence..............15

II.   Defendant Is Improperly Withholding Information Under Exemption 4 ...........................18

      A.   Identities of Companies Who Provided Supplies, Critical Services, and
           Pentobarbital Are Not Commercial or Financial Information.....................................19

      B.   BOP Improperly Withheld Cost, Price, and Contract Term Information Under
           Exemption 4 That Is Not Confidential...........................................................................22

           i.   BOP Fails to Show that Price and Cost Information Are Confidential................24

           ii.  BOP Fails to Show That Identities or the Information That Could Lead to
                Them Are Confidential Information.....................................................................25

III.  Defendant Is Improperly Withholding Information Under Exemption 7 ...........................28

      A.   The Withheld Records Were Not Compiled for Law Enforcement Purposes.............28

IV.   Defendant is Improperly Withholding Material under Exemption 7(A) ............................30

V.    Defendant is Improperly Withholding Material Under Exemptions 6 and 7(C) ................36

VI.   Defendant is Improperly Withholding Material Under Exemptions 7(F) ..........................38

VII.  Defendant is Improperly Withholding Material Under 7(E) ..............................................40

VIII. Defendant Failed to Release all Reasonably Segregable Information................................42

CONCLUSION.................................................................................................................43

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Civil Liberties Union of N. California v. CDCR*, No. CIV 1504195 (Super.
Ct. Mar, 21, 2016) ................................................................................................26

*Am. Civil Liberties Union of N. California v. DEA*, No. C 11-01997 RS, 2011 WL
13243729 (N.D. Cal. Oct. 28, 2011) ....................................................................26

*Am. Civil Liberties Union v. BOP*, 1:20-cv-02320-RBW (D.D.C. Jan. 5, 2021) .........27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................16

*Antonelli v. BOP*, 623 F. Supp. 2d 55 (D.D.C. 2009) ..................................................39

*Associated Press v. FBI*, 265 F. Supp. 3d 82 (D.D.C. 2017) .......................................24

*Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312 (D.C. Cir. 2006) ...........21

*Benavides v. BOP*, 774 F. Supp. 2d 141 (D.D.C. 2011) ...............................................30

*Nebraska ex rel. BH Media Grp., Inc. v. Frakes*, 305 Neb. 780 (2020) ......................26

*Biles v. HHS*, 931 F. Supp. 2d 211 (D.D.C. 2013) ......................................................25

*Blackwell v. FBI*, 646 F. 3d 37 (D.C. Cir. 2011) ........................................................30

*Boeing Co. v. Dep't of Air Force*, 616 F. Supp. 2d 40 (D.D.C. 2009) .........................25

*Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521 (D.C. Cir. 2011) .........15

*Burka v. HHS*, 87 F.3d 508 (D.C. Cir. 1996) ..............................................................14

*Buzzfeed v. DOJ*, 18-cv-1556-TSC (D.D.C.) ..............................................................26

*Campbell v. HHS*, 682 F.2d 256 (D.C. Cir. 1982) ......................................................36

*Canning v. DOS*, 134 F. Supp. 3d 490 (D.D.C. 2015) .................................................17

*Carson v. DOJ*, 631 F.2d 1008 (D.C. Cir. 1980) ..................................................31, 34

*Citizens for Resp. & Ethics in Wash. v. DOJ*, No. 19-cv-03626-DLF (D.D.C.) ..........26

*Citizens for Resp. & Ethics in Washington v. DOJ*, 658 F. Supp. 2d 217 (D.D.C.
2009) ..............................................................................................................34, 36

*Citizens for Responsibility and Ethics in Washington v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) ...................................................................................................................31, 41

*CNA Fin. Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987) ......................................23

*Comptel v. FCC*, 910 F. Supp. 2d 100 (D.D.C. 2012) ...................................................20

*Cover v. Idaho Bd. of Corr.*, 476 P.3d 388 (Idaho 2020) ...............................................26

*Cowsen-El v. DOJ*, 826 F. Supp. 532 (D.D.C. 1992) ....................................................41

*Ctr. For Auto Safety v. DOT*, 133 F. Supp. 3d 109 (D.D.C. 2015)................................24

*Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90 (D.D.C. 2019) ...............15

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976) .....................................................14, 32

*DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989) ................2, 14, 38

*DOS v. Ray*, 502 U.S. 164 (1991) ..................................................................................14

*DOS v. Wash. Post Co.*, 456 U.S. 595 (1982)................................................................37

*Ecological Rights Found. v. U.S. EPA*, No. CV 19-980 (BAH), 2021 WL 535725 (D.D.C. Feb. 13, 2021) ........................................................................................42

*FBI v. Abramson*, 456 U.S. 615 (1982) .........................................................................29

*In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145-TSC, 2020 WL 4915563 (D.D.C. Aug. 15, 2020) ......................................6

*In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5199, Doc. No. 1851483 (D.C. Cir. July 13, 2020) .......................................................................6

*Fischer v. DOJ*, 723 F. Supp. 2d 104 (D.D.C. 2010) ....................................................40

*Food Mktg. Instit. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) .............................22

*Furman v. Georgia*, 408 U.S. 238 (1972).........................................................................3

*Gellman v. Dep't of Homeland Sec.*, No. 16-CV-635 (CRC), 2020 WL 1323896 (D.D.C. Mar. 20, 2020).........................................................................................21

*Greenberg v. FDA*, 803 F.2d 1213 (D.C. Cir. 1986) ....................................................26

*Hartkemeyer v. Barr*, No. 2:20-cv-336-JMS-MJD, 2020 WL 8084514 (July 8, 2020) ......................................................................................................................5

*Henderson v. DOJ*, 157 F. Supp. 3d 42 (D.D.C. 2016) ................................................30

*Hodes v. HUD*, 532 F. Supp. 2d 108 (D.D.C. 2008) ................................................................20, 26

*Hodes v. U. S. Dep't of Treasury*, 342 F. Supp. 3d 166 (D.D.C. 2018) ........................................25

*Horowitz v. Peace Corps*, 428 F.3d 271 (D.C. Cir. 2005)......................................................38, 39

*Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir.1995)................................................16

*Indiana Dep't of Corr. v. Toomey*, 162 N.E.3d 1099 (Ind. 2021)................................................26

*JCI Metal Prods. v. U.S. Dep't of the Navy*, No. 09-CV-2139 IEG (AJB), 2010 WL 2925436 (S.D. Cal. July 23, 2010) ...........................................................................25

*Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C. 2019) ........................15

*Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108 (D.C. Cir. 2004) ....................................................37

*Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13 (D.D.C. 2011) ...................21

*Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31 (D.D.C. 2009)..........................20

*LeCroy v. U.S.*, No. 20-13353, 2020 WL 5542483 (11th Cir. Sept. 16, 2020) .............................5

*Lee v. U.S.*, No. 4:97-cr-243-KGB, ECF No. 14-1 (E.D. Ark. July 2, 2020) ...............................5

*Lewis v. Dep't of Treasury*, No. 17-cv-0943 (DLF), 2020 WL 1667656 (D.D.C. Apr. 3, 2020).................................................................................................. 29

*Linn v. DOJ*, No. 36-1, 1995 WL 631847 (D.D.C. Aug. 22, 1995) ........................................38, 39

*Londrigan v. FBI*, 670 F.2d 1164 (D.C. Cir.1981) .....................................................................17

*Long v. DOJ*, 450 F. Supp. 2d 42 (D.D.C. 2006) .........................................................................39

*Mapother v. DOJ*, 3 F.3d 1533 (D.C. Cir. 1993)........................................................................31

*Maydak v. DOJ*, 218 F.3d 760 (D.C. Cir. 2000)........................................................................36

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004)..............................................................................................................25

*Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ...............................................................................................................42, 43

*Miller v. Casey*, 730 F.2d 773 (D.C. Cir. 1985) ........................................................................15

*Miller v. DOJ*, 562 F. Supp. 2d 82 (D.D.C. 2008).......................................................................39

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011).......................................................................14, 32

*Mokhiber v. U.S. Dep't of Treasury*, 335 F. Supp. 2d 65 (D.D.C. 2004) ......................................43

*Moorefield v. U.S. Secret Serv.*, 611 F.2d 1021 (5th Cir. 1980)...............................................32, 33

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978)...................................................19

*North v. DOJ*, 774 F.Supp.2d 217 (D.D.C. 2011) ...........................................................42

*Occidental Petroleum Corp. v. SEC*, 873 F.2d 325 (D.C. Cir. 1989)..............................................23

*Peterson v. Barr*, No. 2:20-cv-350-JMS-DLP, 2020 WL 3956247 (S.D. Ind. July
 10, 2020) ...............................................................................................................5

*Pinson v. DOJ*, 202 F. Supp. 3d 86 (D.D.C. 2016)............................................................38

*Pub. Citizen Health Res. Grp. v. FDA*, 704 F.2d 1280 (D.C. Cir. 1983)....................................19

*Pub. Citizen v. HHS*, 975 F. Supp. 2d 81 (D.D.C. 2013)...............................................20

*Pub. Employees for Envtl. Responsibility (Peer), Rocky Mountain Chapter v.
 EPA*, 978 F. Supp. 955 (D. Colo. 1997) .....................................................................38

*Racal-Milgo Gov't Sys., Inc. v. Small Bus. Admin.*, 559 F. Supp. 4 (D.D.C. 1981) .....................24

*Raher v. BOP*,
 No. CV-09-526-ST, 2011 WL 2014875 (D. Or. May 24, 2011) ............................................30

*Roth v. DOJ*, 642 F.3d 1161 (D.C. Cir. 2011) ...........................................................42

*Sanchez-Alaniz v. BOP*, 85 F. Supp. 3d 208 (D.D.C. 2015).................................................39

*Sarno v. DOJ*, 278 F. Supp. 3d 112 (D.D.C. 2017) ....................................................33, 35

*Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668 (D. Ariz. Oct.
 7, 2013) ..............................................................................................................26

*Schoenman v. FBI*, 575 F. Supp. 2d 166 (D.D.C. 2008)...................................................17

*Shapiro v. DOJ*, 37 F. Supp. 3d 7 (D.D.C. 2014) ..........................................................17

*Smith v. Barr*,
 No. 2:20-cv-630-JMS-DLP, 2021 WL 71168 (S.D. Ind. Jan. 7, 2021)...............................5, 12

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ................................................31

*Tex. Dep't of Criminal Justice v. Levin*, 572 S.W.3d 671 (Tex. 2019)..........................................26

*United Techs. Corp. v. DOD*, 601 F.3d 557 (D.C. Cir. 2010) .......................................................23

*Walston v. DOD*, 238 F. Supp. 3d 57 (D.D.C. 2017) ..................................................37

*Wash. Post Co. v. HHS*, 690 F.2d 252 (D.C. Cir. 1982)..............................................28

*Washington Post Co. v. DOJ*, 863 F.2d 96 (D.C. Cir. 1988)........................................37

*Washington Research Project, Inc. v. U.S. Dep't of Health, Educ. and Welfare*,
    504 F.2d 238 (D.C. Cir. 1974)............................................................................22

*Wisdom v. U.S. Trustee Program*, 232 F. Supp. 3d 97 (D.D.C. 2017) ........................40

*WP Co. LLC v. U.S. Small Bus. Admin.*, No. CV 20-1240 (JEB), 2020 WL
    6504534 (D.D.C. Nov. 5, 2020)..........................................................................27

**Statutes**

5 U.S.C. § 552(7)(E) ......................................................................................................40

5 U.S.C. § 552(a)(4)(B) .................................................................................................15

5 U.S.C. § 552(a)(8)(A)(i) .............................................................................................15

5 U.S.C. § 552(b) .....................................................................................................14, 42

5 U.S.C. § 552(b)(4) ......................................................................................................19

5 U.S.C. § 552(b)(6) ......................................................................................................36

5 U.S.C. § 552(b)(7) ......................................................................................................28

5 U.S.C. § 552(b)(7) ......................................................................................................28

50 U.S.C. §§ 3121-3122 ................................................................................................28

28 CFR § 26 (2021) .......................................................................................................34

Fed. R. Civ. P. 56(a) ......................................................................................................16

Ark. Code Ann. § 5-4-617(h)(i)(1)(B) ..........................................................................28

Miss. Code. Ann. § 99-19-51(6)(c)................................................................................28

Tex. Crim. Proc. Code Ann. art. 43.14(b)(2) ................................................................28

## Other Authorities

ABA, *Nevada Agrees to Return Supply of Execution Drugs to Manufacturers*,
(July 24, 2020),
https://www.americanbar.org/groups/committees/death_penalty_representatio
n/project_press/2020/summer/nevada-to-return-execution-drugs/ ...........................................9

ACLU, *Federal Executions in the Time of COVID-19*,
https://www.aclu.org/other/federal-executions-time-covid-19................................................12

ACLU Press Release, *FOIA Data Reveal Inadequate Testing and Precautions,
Followed by COVID-19 Outbreak and Deaths*, Sept. 21, 2020,
https://www.aclu.org/press-releases/bop-data-show-federal-executions-likely-
caused-covid-19-spike ............................................................................................12

*ACLU Statement on the 13th and Final Federal Execution*, January 16, 2021,
https://www.aclu.org/press-releases/aclu-statement-13th-and-final-federal-
execution .....................................................................................................12

ACLU (@ACLU), *In the middle of a pandemic, this administration decided to
resume federal executions for the first time in 17 years. These are the
consequences*. Twitter. Oct. 24, 2020,
https://twitter.com/ACLU/status/1320139006013833216....................................................12

ACLU (@ACLU), *The unprecedented federal executions being carried out by the
Trump Administration aren't just reckless and inhumane. They're also costing
taxpayers at least $900,000 per death, according to reports we uncovered*.
Twitter, (Jan. 9, 2021),
https://twitter.com/ACLU/status/1348065269487435776......................................................12

AP, *Worker aiding preparation for federal execution tests positive for COVID-19*,
USA Today (July 12, 2020)
https://www.usatoday.com/story/news/politics/2020/07/12/covid-19-worker-
aiding-prep-federal-execution-tests-positive/5424353002/;......................................................6

*Attorney General's Concern About Crime Victims and Their Families Rings
Hollow*, The Appeal (Jan. 6, 2020), https://bit.ly/2BnphAJ .....................................................3

Biden Plan for Strengthening America's Commitment to Justice,
https://joebiden.com/justice/ ....................................................................................34

Cassandra Stubbs, *Atrocities of the Federal Death Penalty*, ACLU, Feb. 2, 2021,
https://www.aclu.org/news/capital-punishment/atrocities-of-the-federal-death-
penalty/..............................................................................................................12

Chris McDaniel, *Inmates Said the Drug Burned as They Died. This is How Texas Gets Its Execution Drugs,* Buzzfeed News, Nov. 28, 2018, https://www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas ............................................................10, 18

Chris McDaniel, *Missouri Fought for Years to Hide Where it Got Its Execution Drugs. Now We Know What They Were Hiding*, Buzzfeed, Feb. 28, 2018.............................19

C-Span, Video of Attorney General Confirmation Hearing, Day 1, Feb. 22, 2021, https://www.c-span.org/video/?508877-1/attorney-general-confirmation-hearing-day-1 ................................................................................................10

Chris McDaniel, *FBI Documents Don't Back Up Claimed Threat to Execution Drug Supplier*, BuzzFeed, Aug. 29, 2016...........................................................18

DPIC, *ACLU: Documents Show Federal Executions Likely Caused Prison COVID-19 Outbreak*, Sept. 22, 2020, https://deathpenaltyinfo.org/news/aclu-documents-show-federal-executions-likely-caused-prison-covid-19-outbreak.....................12

*Deadly Pandemic*, New York Intelligencer (July 14, 2020), https://nymag.com/intelligencer/2020/07/restarting-federal-executions-covid-19-unjustifiable.html ............................................................................3

*Deaths Scheduled Soon*, NPR (July 10, 2020), https://www.npr.org/2020/07/10/889667257/federal-executions-set-to-resume-after-17-years-with-3-deaths-scheduled-soon;Ben ..................................................3

Editorial Board, *Opinion: Trump pushes and unprecedented and unjust wave of executions*, Wash. Post, Nov. 29, 2020........................................................3

Emma G. Ellis, *Federal Executions During Covid-19 Put Innocent Lives at Risk*, Wired, https://www.wired.com/story/federal-executions-covid-19/ ........................12

Erik Eckholm, *Pfizer Blocks the Use of Its Drugs in Executions*, N. Y. Times, May 13, 2016, https://www.nytimes.com/2016/05/14/us/pfizer-execution-drugs-lethal-injection.html...............................................................9

*Federal Death Penalty*, ACLU, Feb. 2, 2021, https://www.aclu.org/news/capital-punishment/atrocities-of-the-federal-death-penalty/.....................................12

Chris McDaniel, *Missouri Fought for Years to Hide Where it Got Its Execution Drugs. Now We Know What They Were Hiding,* Buzzfeed, Feb. 28, 2018.............................19

Chris McDaniel and Chris Geidner, *Arizona, Texas Purchased Execution drugs Illegally Overseas, But FDA Halts the Import*, October 22, 2015, https://www.buzzfeednews.com/article/chrismcdaniel/arizona-texas-purchased-execution-drugs-illegal...........................................................10

Hailey Fuchs, *Federal Executions to Resume Amid a Pandemic and Protests*, N. Y. Times, June 30, 2020 ...............................................................................................3, 38

Hailey Fuchs, *Virus Hits Federal Death Row, Prompting Calls for Delays in Executions*, N. Y. Times, Dec. 21, 2020, https://www.nytimes.com/2020/12/21/us/politics/coronavirus-death-row-executions.html ....................................................................................................................5

Henderson Hill, *New Data Connect the Federal Executions and a COVID-19 Outbreak in Indiana*, ACLU, https://www.aclu.org/news/capital-punishment/new-data-connect-the-federal-executions-and-a-covid-19-outbreak-in-indiana/ ..........................................................................................................12

*How Biden Can Reverse Trump's Death Penalty Expansion*, Marshall Project (March 12, 2021), https://www.themarshallproject.org/2021/03/12/how-biden-can-reverse-trump-s-death-penalty-expansion .........................................................................34

Isaac Arnsdorf, *Inside Trump and Barr's Last-Minute Killing Spree*, ProPublica, (Dec. 23, 2020),  https://www.propublica.org/article/inside-trump-and-barrs-last-minute-killing-spree ..............................................................................................4

Jessica Constant and A. Russell, *COVID-19 on Death Row*, ABA, Oct. 30,  2020, https://www.americanbar.org/groups/committees/death_penalty_representatio n/publications/project_blog/covid-19-on-death-row/ ..............................................12

Jessica Shulberg, *The Trump Administration is Rushing to Execute People in the Middle of a Pandemic*, HuffPost, Sept. 24, 2020, https://www.huffpost.com/entry/trump-federal-execution-pandemicn5f6bdc2ac5b674713cc71873 ........................................................................12

Joe Biden, *The Biden Plan for Strengthening America's Commitment to Justice*..........................4

Joe Davison, *President Trump's Expensive Death Penalty Binge Could Continue Next Week*, Wash. Post, Jan. 9, 2021 ..........................................................................13

Jon Herskovitz and Steve Barnes, *Company Sues Arkansas, Charging Fraud Over Lethal Injection Drugs*, Reuters, April 18, 2017 ....................................................9

Jon Jackson, *Stop Brandon Bernard's Execution Petition Garners More than 390K Signatures*, Newsweek, Dec. 12, 2020..........................................................3

Jon Webb, *COVID: There May be Another Source of Infections in Indiana – Federal Executions*, Courier & Press, Dec. 8, 2020, https://www.courierpress.com/story/opinion/columnists/jon-webb/2020/12/08/covid-aclu-says-federal-executions-could-bring-infections-indiana/6482213002/..................................................................................................12

Jonathan Allen, *U.S. Lawmakers Ask Four Companies about Role in Government's Execution Drugs*, Reuters, July 14, 2020 ........................................................24

Katherine Fung, *Petition to Halt Dustin Higg's Execution Amasses Over 1.5 Million Signatures*, Newsweek, Jan. 12, 2021 ..........................................................................3

Keri Blakinger and Maurice Chammah, *A $6,300 Bus. A $44 Last Meal. What New Documents Tell Us About Trump's Execution Spree*, The Marshall Project, Jan. 14, 2021, https://www.themarshallproject.org/2021/01/14/a-6-300-bus-a-33-last-meal-what-new-documents-tell-us-about-trump-s-execution-spree ..............................................................................................13

Khaleda Rahman, *Federal Execution Planner Tests Positive for Coronavirus As Family of Victim Urge Postponement*, Newsweek (July 13, 2020).......................................39

Khaleda Rahman, *Lisa Montgomery's Lawyers Have COVID, Seek Delay Arguing Barr 'Recklessly Scheduled' Federal Execution Amid Pandemic*, Newsweek, Nov. 15, 2020 ...........................................................................................6

Khaleda Rahman, *Trump Admin Spent Millions Carrying Out Federal Executions In a Pandemic*, Newsweek, Jan. 14, 2021 .............................................................13

*Lethal Injection Business*, CBS NEWS: MONEYWATCH, January 6, 2011, https://www.cbsnews.com/news/drug-company-driving-school-its-all-the-same-in-the-lethal-injection-business/(noting...........................................................10

*Lethal-Injection Drugs*, New Yorker, May 21, 2016, https://www.newyorker.com/news/news-desk/the-end-of-the-open-market-for-lethal-injection-drugs .........................................................................................9

Liliana Segura, *After Trump's Execution Spree, Lingering Trauma and A Push for Abolition*, The Intercept, Feb. 6, 2021 ....................................................................24

Liliana Segura, *The Hidden Cruelty of Trump's Executions*, The Intercept, Oct. 17, 2020.....................................................................................................4

Madeline Carlisle, *Amid Large Scale COVID-19 Outbreak on Death Row, Trump Administration Continues and Unprecedented Week of Executions*, Time, January 14, 2021 .........................................................................................6

Mark Berman, *Drug Companies Don't Want to Be Involved in Executions, So They're Suing To Keep Their Drugs Out*, Wash. Post, Aug. 13, 2018 ...................................18

Michael Balsamo, *Biden to End Executions as Government sets 3 More*, AP News (Nov. 21, 2020), https://apnews.com/article/joe-biden-prisons-inaugurations-coronavirus-pandemic-executions-365258989e6be8d7077b2f67d8c3e190...........................34

Michael Balsamo and Michael Tarm, *Mental fitness claim halts 2nd federal execution – for now*, AP, July 15, 2020, https://apnews.com/article/virus-outbreak-terre-haute-executions-ks-state-wire-mo-state-wire-44465354fd8219a0bc2fec0962c526ec ................................................................................4

Michael Term, Michael Balsamo and Michael R. Sisak, *AP Analysis: Federal Executions Likely a COVID Superspreader*, Feb. 5, 2021 .......................................6

Nathalie Baptiste, *How Trump's Rush to Execute Inmates is Spreading COVID, Mother Jones* (Dec. 8, 2020), https://www.motherjones.com/crime-justice/2020/12/how-trumps-rush-to-execute-inmates-is-spreading-covid/ .......................5, 12

Nathalie Baptiste, *The Trump Admin's Execution Spree May Have Caused a Coronavirus Outbreak*, Mother Jones, September 21, 2020, https://www.motherjones.com/crime-justice/2020/09/the-trump-admins-execution-spree-may-have-caused-a-coronavirus-outbreak/ ....................................................12

Nina T. Harawa, *As COVID-19 Flares Behind Bars, Now's Not the Time for More Terre Haute Executions*, IndyStar (Updated July 11, 2020) ..................................38

Rachel Ramirez, *The high rate of executions during Trump's last weeks in office, explained*, Vox, Dec. 11, 2020, https://www.vox.com/21736993/trump-federal-execution-december ................................................................................................3

S. Rep. No. 109-329 (2006) (report accompanying Federal Funding Accountability and Transparency Act of 2006) ....................................................28

Virginia Heffernan, *Trump's executions set a sicko record for the United States*, , L.A. Times, (Dec. 11, 2020), https://www.latimes.com/opinion/story/2020-12-11/donald-trump-joe-biden-execution-pardon-lame-duck ......................................................34

Walter Pavlo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in prisons*, Forbes, April 1, 2020, https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#3daee69b7ba3 .................................................7

Yusuf Ahmed, *We've Had Enough Death in 2020. Why Add More?* ACLU, (Dec. 7, 2020), https://www.aclu.org/news/capital-punishment/weve-had-enough-death-in-2020-why-add-more/ ........................................................................................6

**INTRODUCTION**

Plaintiffs American Civil Liberties Union and American Civil Liberties Union Foundation (ACLU) seek information related to the fiscal and public health costs imposed by the federal government's decision to carry out an unpreceded number of executions in 2020 and January of 2021, during the COVID-19 pandemic. Defendant Federal Bureau of Prisons released some of the requested information in response to this Court's orders directing BOP to respond in advance of scheduled execution dates. BOP withheld in part and in full numerous documents, including information regarding: the amounts spent on some expenses, including the costs of the drugs used in the executions and payment to contractors who procured and performed services related to the drugs and executions; the numbers of BOP staff and contractors involved in carrying out the executions; the job titles and posts of individuals assigned to carry out the executions; and the identities of the companies involved in procuring, manufacturing and/or delivering the execution drugs or medical equipment or in performing other critical services. BOP seeks to shield the information from public scrutiny on the basis of FOIA exemptions 4, 6, 7(A), 7(C), 7(E), and 7(F).

The withheld information goes to an important matter of public interest: the competency of the federal government in carrying out this string of executions. The information already disclosed because of this suit paints a grim picture of government recklessness with respect to the risks of spreading COVID-19 to staff and prisoners at the Terre Haute prisons, to BOP prisons around the country, and to their surrounding communities. But important questions remain unanswered, such as the total amount spent on the executions, how many staff were involved in the executions, and the lengths to which the government went in order to carry out the executions. It is unknown, for example, whether BOP paid more than market value to acquire

1

lethal injection drugs or the quality of the drugs they procured. The federal executions have been subject to extensive public reporting before, during, and in the wake of these executions and these questions are of great interest to the public as it considers the future of capital punishment in (and even outside) the federal system.

BOP nonetheless seeks to shield these documents through unsupported and highly attenuated assertions of possible threats or harm to individuals or company reputations. BOP's arguments for the applications of these exemptions should be rejected. BOP fails to meet its burden of showing adequate evidentiary support for the exemptions it seeks to invoke. Most importantly, BOP's proposed interpretations of the FOIA exemptions would allow the government to exclude from the public view actions by the federal government simply because the government believes those actions may be controversial or inconvenient.  BOP's arguments subvert the purpose of FOIA and prevent the public from learning "what the government is up to." *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749,780 (1989).

Both parties have now moved for summary judgment. The ACLU does not seek disclosure of withheld information about the identities of individuals, the blueprints of the execution chamber, or weapons information and does not challenge the adequacy of BOP's search. The ACLU contests, however, BOP's efforts to withhold responsive cost information, descriptions of the numbers of individuals and staff involved in the executions, and the identities of companies providing execution services, drugs, or equipment. And even if some information has been properly withheld under those exemptions, BOP has failed to adequately segregate and produce the non-exempt material.

## BACKGROUND AND PROCEDRUAL HISTORY

**1. The Trump Administration's Decision to Restart Executions During the COVID-19 Pandemic and the Fall 2020 Elections**

In the midst of a global pandemic, the federal government announced its intention in June of 2020 to resume federal executions after a seventeen-year hiatus. It initially scheduled three executions for one week in the middle of July and two for the last week in August. Previously, only three federal executions had been carried out since 1963, the last federal execution before the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). The resumption of federal executions in 2020 was a matter of intense public interest, extensively covered by the media.[1] Ultimately, the federal government executed thirteen individuals between July of 2020 and January of 2021, despite significant public opposition and public health risk. *See, e.g.,* Editorial Board, *Opinion: Trump pushes and unprecedented and unjust wave of executions*, Wash. Post (Nov. 29, 2020), https://www.washingtonpost.com/opinions/trump-pushes-an-unprecedented-and-unjust-wave-of-executions/2020/11/26/e8d06606-2f59-11eb-bae0-50bb17126614_story.html (opposing the administration's "sickening spree of executions"); Jon Jackson, *Stop Brandon Bernard's Execution Petition Garners More than 390K Signatures*, Newsweek, (Dec. 12, 2020), https://www.newsweek.com/brandon-bernard-execution-petition-1553876;  Katherine Fung, *Petition to Halt Dustin Higg's Execution Amasses Over 1.5 Million*

---

[1] *See, e.g.*, Hailey Fuchs, *Federal Executions to Resume Amid a Pandemic and Protests*, N. Y. Times, June 30, 2020; Carrie Johnson, *Federal Executions Set to Resume After 17 Years With 3 Deaths Scheduled Soon*, NPR (July 10, 2020), https://www.npr.org/2020/07/10/889667257/federal-executions-set-to-resume-after-17-years-with-3-deaths-scheduled-soon; Ben Miller & Daniel S. Harawa, *Why the Attorney General's Concern About Crime Victims and Their Families Rings Hollow*, The Appeal (Jan. 6, 2020), https://bit.ly/2BnphAJ (quoting Earlene Peterson as saying "it would 'shame my daughter that someone has to die for her'); Rachel Ramirez, *The high rate of executions during Trump's last weeks in office, explained*, Vox (Dec. 11, 2020), https://www.vox.com/21736993/trump-federal-execution-december; Andrew Cohen, *Killing in Our Name During a Deadly Pandemic*, New York Intelligencer (July 14, 2020), https://nymag.com/intelligencer/2020/07/restarting-federal-executions-covid-19-unjustifiable.html.

*Signatures*, Newsweek, (Jan. 12, 2021), https://www.newsweek.com/petition-halt-dustin-higgs-execution-amasses-over-15-million-signatures-1560842; Liliana Segura, *The Hidden Cruelty of Trump's Executions*, The Intercept, (Oct. 17, 2020), https://theintercept.com/2020/10/17/trump-execution-christopher-vialva/.

President Donald Trump was running for re-election in the fall of 2020 and he made the resumption of executions part of his law and order campaign, boasting about the executions. *See, e.g.*, Michael Balsamo and Michael Tarm*, Mental fitness claim halts 2nd federal execution – for now,* AP, (July 15, 2020), https://apnews.com/article/virus-outbreak-terre-haute-executions-ks-state-wire-mo-state-wire-44465354fd8219a0bc2fec0962c526ec ("President Donald Trump's campaign touted the Lee execution in an email blast, saying the President 'Ensured Total Justice for the Victims of an Evil Killer'" and demanding his political opponent Joe Biden explain why he now opposes capital punishment"); Isaac Arnsdorf, *Inside Trump and Barr's Last-Minute Killing Spree*, ProPublica, (Dec. 23, 2020),  https://www.propublica.org/article/inside-trump-and-barrs-last-minute-killing-spree (describing a White House Press Conference after the first execution where Trump attacked Biden for his position on the death penalty and quoting Trump's campaign statement from 2016 in favor of "[D]eath penalty all the way.") His opponent, President Joseph Biden, ran on a platform to end the federal death penalty and general opposition to capital punishment. *See* Joe Biden, *The Biden Plan for Strengthening America's Commitment to Justice*, joebiden.com/justice/ ("Eliminate the death penalty.").

The constitutionality of the rushed executions was the subject of significant litigation, including litigation related to the threats of the spread of COVID-19 posed by carrying out executions during the pandemic. The ACLU sued federal government officials William Barr and Michael Carvajal on behalf of Seigen Hartkemeyer, the long-time spiritual advisor to Wesley

Purkey, the second person executed. *Hartkemeyer v. Barr,* No. 2:20-cv-336-JMS-MJD, 2020 WL 8084514 (July 8, 2020). The suit alleged that carrying out the execution during the pandemic burdened Mr. Hartkemeyer's exercise of religion by forcing him to choose between violating his sincere religious beliefs and obligations to Mr. Purkey and protecting his own health. *Id*. Victim family members also challenged the scheduling of the executions in court, as did counsel for the death row prisoners. *See Peterson v. Barr*, No. 2:20-cv-350-JMS-DLP, 2020 WL 3956247, at *1 (S.D. Ind. July 10, 2020), *vacated*, 965 F.3d 549 (7th Cir. 2020) (suit by victim family members seeking to postpone execution of Daniel Lee to avoid risk to their health); *Lee v. U.S.*, No. 4:97-cr-243-KGB, ECF No. 14-1 (E.D. Ark. July 2, 2020) (defense counsel's motion to modify execution date because of the conflict between their sixth amendment obligations and need to protect their health); *LeCroy v. U.S.*, No. 20-13353, 2020 WL 5542483 (11th Cir. Sept. 16, 2020) (motion by counsel, medically vulnerable due to chronic illness, to reschedule execution date so he could attend). Two prisoners incarcerated at the Terre Haute prison filed a putative class action law suit alleging that the executions constituted an unconstitutional risk of spread of COVID-19 through the prison. *Smith v. Barr*, No. 2:20-cv-630-JMS-DLP, 2021 WL 71168 (S.D. Ind. Jan. 7, 2021) (granting preliminary injunction and ordering some COVID-19 precautionary measures). None of these suits resulted in postponing of the executions, but they prompted intense media coverage and public debate.[2] Ultimately, a spiritual advisor, members of the BOP

---

[2] *See, e.g, Worker aiding preparation for federal execution tests positive for COVID-19*, USA Today (July 12, 2020), https://www.usatoday.com/story/news/politics/2020/07/12/covid-19-worker-aiding-prep-federal-execution-tests-positive/5424353002/; Emma Grey Ellis, *Federal Executions During COVID-19 put Innocent Lives at Risk*, Wired, (Sept. 24, 2020), https://www.wired.com/story/federal-executions-covid-19/; Nathalie Baptiste, How Trump's Rush to Execute Inmates in Spreading COVID, (Dec. 8, 2020), https://www.motherjones.com/crime-justice/2020/12/how-trumps-rush-to-execute-inmates-is-spreading-covid/; Hailey Fuchs, *Virus Hits Federal Death Row, Prompting Calls for Delays in Executions*, N. Y. Times, (Dec. 21, 2020), https://www.nytimes.com/2020/12/21/us/politics/coronavirus-death-row-executions.html.

execution team, death row prisoners, defense attorneys, and hundreds of prisoners at FCI Terre Haute contracted COVID-19 related to the executions.[3]

The federal government's method of execution, lethal injection with compounded pentobarbital, was also the subject of extensive litigation. Among other claims, death row prisoners alleged that use of pentobarbital posed an unconstitutional risk of extreme pain and suffering because of evidence that the prisoners executed suffered excruciating flash pulmonary edema, a form of respiratory distress akin to drowning.  *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5199, Doc. No. 1851483 (D.C. Cir. July 13, 2020) (denying government's motion for stay pending appeal of preliminary injunction that barred executions of four federal prisoners in light of  evidence that the use of pentobarbital posed a substantial risk of serious harm), *vacated by Barr v. Lee*, No. 20A8, 2020 WL 3964985, *4 (U.S. July 14, 2020) (per curiam) (vacating the preliminary injection because the plaintiffs failed to make "the showing required to justify last-minute intervention"); *In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145-TSC, 2020 WL 4915563, *1 (D.D.C. Aug. 15, 2020) (order denying expedited trial on the claim in advance of an August execution date, although acknowledging new evidence from the autopsy of one of the men executed in July

---

[3] *See* Michael Term, Michael Balsamo and Michael R. Sisak, *AP Analysis: Federal Executions Likely a COVID Superspreader*, (Feb. 5, 2021), (noting "a least a dozen other people, including execution team members, media witnesses and a spiritual adviser, tested positive within the incubation period of the virus, meeting the criteria of a superspreader event," and that while the real tally of all those infected would never be known because of the lack of contract tracing, prisoner cases also spiked within the incubation period of executions); *see also* Madeline Carlisle, *Amid Large Scale COVID-19 Outbreak on Death Row, Trump Administration Continues and Unprecedented Week of Executions*, Time, (January 14, 2021), https://time.com/5928974/coronavirus-death-row-prisoners-executions-trump/; Khaleda Rahman, *Lisa Montgomery's Lawyers Have COVID, Seek Delay Arguing Barr 'Recklessly Scheduled' Federal Execution Amid Pandemic*, Newsweek, (Nov. 15, 2020), https://www.newsweek.com/lisa-montgomery-lawyer-covid-1547536 (defense attorneys who contracted COVID-19 after visiting federal client scheduled for execution); Yusuf Ahmed, *We've Had Enough Death in 2020. Why Add More?* ACLU, (Dec. 7, 2020), https://www.aclu.org/news/capital-punishment/weve-had-enough-death-in-2020-why-add-more/ (spiritual advisor who contracted COVID-19 after attending execution in November, 2020).

showed that his "lungs filled with fluid and that he suffered excruciating air hunger while still alive.").

Through much of the federal litigation around the executions and COVID-19 and the method of execution, BOP submitted declarations by regional counsel Rick Winter, a self-disclosed member of the federal execution team, and T.J. Watson, the Warden at Terre Haute. *See* Stubbs Decl. Ex. 1, pp. 10-12 (Winter Dec. 2019 Declaration); Stubbs Decl. Ex. 3 (Winter July 2020 Declaration); Stubbs Decl. Ex. 4 (Watson Dec. 2020 Declaration). BOP's descriptions of the numbers of staff involved in the federal executions shifted over time. In December of 2019, in the context of the government's argument that it would be difficult to postpone initial plans for December executions, Mr. Winter described the BOP executions as involving: (1) the "execution team, which consists of over 40 BOP staff members," Stubbs Decl. Ex. 1, pp. 10-12 (Winter Dec. 2019 Declaration ¶ 5); (2) "approximately 200 FCC Terre Haute staff," *id*. ¶ 8; (3) "specialized BOP teams such as Special Operations Response Teams (SORT) and Disturbance Control Teams (DCT)," consisting of approximately 50 individuals who would travel to FCC Terre Haute from other BOP institutions, *id*. ¶ 10; (4) "contractors who have made themselves available," *id*. ¶ 6; and (5) a number of BOP administrators. *Id*. ¶ 5. In July of 2020, Mr. Winter reduced the number of BOP staff members at FCC Terre Haute from 200 to 100, along with the 40-person execution team and 50 members of specialized security teams. Stubbs Decl. Ex. 3. (Winter Decl. ¶ 11). In December 2020, Warden Watson attested that BOP estimated between 50 and 125 individuals, including witnesses and demonstrators, would travel to FCC Terre Haute for the executions. Stubbs Decl. Ex. 4 (Watson Decl. ¶ 16). According to Warden Watson, the security and support personnel involved in the SORT and DCT teams who travelled to FCC

Terre Haute from other BOP institutions would not participate in the December or January executions. *Id*. at ¶ 18.

BOP shifted its explanations about COVID-19 precautions taken in connection with the executions as well.  Some of the representations by Mr. Winter and BOP regarding the government's COIVD-19 precautions were found to be false or misleading by the Southern District of Indiana. *Smith v. Barr*, 2021 WL at *6 (concluding that the December 4, 2020 declaration by BOP Warden Watson under penalty of perjury regarding contact tracing "has proven to be wholly false."); *id*. at *9 (BOP representatives "claim to have implemented mask-wearing but have failed to enforce compliance" and although they represented to the Court that "contact tracing would occur after any BOP staff member involved in the executions tested positive," such tracing did not occur - "not by accident but by design."). Public reporting has also questioned the veracity of some of BOP's release of COVID-19 data. *See, e.g.*, Walter Pavlo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in prisons*, Forbes, (April 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#3daee69b7ba3 ("[P]erhaps Congress and Attorney General Barr are getting accurate information on COVID-19 outbreaks in prison but one fact is certain, the general public is not.").

The questions regarding whether medical companies should be involved in the business of executions and whether lethal injection imposes unacceptable risks of pain and suffering have been the topic of extensive reporting, litigation, and public debate over the past decade. No pharmaceutical manufacturer has ever endorsed the use of its medicines in lethal injection procedures. To the contrary, for more than a decade companies have objected to the misuse of their medicines in executions, and over the last 10 years FDA-approved manufacturers of drugs

used in executions in the USA have declared their unequivocal rejection of the use of their drugs for executions and imposed contractual controls to prohibit their use for that purpose. *See* Erik Eckholm *Pfizer Blocks the Use of Its Drugs in Executions*, N. Y. Times, (May 13, 2016), https://www.nytimes.com/2016/05/14/us/pfizer-execution-drugs-lethal-injection.html (noting after Pfizer all major suppliers had prohibited their drugs from lethal injection); *see also* Linc Caplan *The End of the Open Market for Lethal-Injection Drugs*, New Yorker, (May 21, 2016), https://www.newyorker.com/news/news-desk/the-end-of-the-open-market-for-lethal-injection-drugs ("Drug companies, for their part, didn't want their drugs used in executions, and tried maneuvers, many without success, to prevent that use."). In at least two instances when public reporting or litigation has revealed breaches of those agreements, the manufacturers have even sued to prohibit the use of the drugs. *See* ABA, *Nevada Agrees to Return Supply of Execution Drugs to Manufacturers*, (July 24, 2020), https://www.americanbar.org/groups/committees/death_penalty_representation/project_press/2020/summer/nevada-to-return-execution-drugs/; Jon Herskovitz and Steve Barnes, *Company Sues Arkansas, Charging Fraud Over Lethal Injection Drugs*, Reuters, (April 18, 2017), https://www.reuters.com/article/us-arkansas-execution/company-sues-arkansas-charging-fraud-over-lethal-injection-drugs-idUSKBN17K2P8.

With mainstream manufacturers unwilling to permit the use of their drugs in executions, jurisdictions have attempted to turn to compounding pharmacies or importers to acquire the drugs. Public reporting has exposed numerous instances of problems from these tactics, ranging from the procurement of poor quality or expired drugs to contracts with companies with poor safety standards and use of sham shell companies or illegal tactics. *See, e.g.*, Chris McDaniel, *Inmates Said the Drug Burned as They Died. This is How Texas Gets Its Execution Drugs,*

Buzzfeed News, (Nov. 28, 2018), https://www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas (investigative reporter uncovered that Texas contracted with a compounding pharmacy with 48 health and safety violations, including preparing the wrong medication for three children); Chris McDaniel and Chris Geidner, *Arizona, Texas Purchased Execution drugs Illegally Overseas, But FDA Halts the Impor*t, (October 22, 2015), https://www.buzzfeednews.com/article/chrismcdaniel/arizona-texas-purchased-execution-drugs-illegal; *Georgia Delays Woman's Execution Because of "Cloudy" Lethal Injection Drug*, Guardian, (March 2, 2015), https://www.theguardian.com/world/2015/mar/03/georgia-delays-womans-execution-because-of-cloudy-lethal-injection-drug(noting that Georgia in the past had used a compounding pharmacy to acquire pentobarbital for use in executions); Jim Edwards, *Drug Company? Driving School? It's All the Same in the Lethal Injection Business*, CBS NEWS: MONEYWATCH, (January 6, 2011), https://www.cbsnews.com/news/drug-company-driving-school-its-all-the-same-in-the-lethal-injection-business/ (noting that because U.S. pharmaceutical companies don't want their drugs associated with "deliberately killing people" ten states attempted to acquired supplies of Sodium Thiopental in 2010 from Dream Pharma, a pharmacy in England apparently operating out of a back room in a driving school").

On January 20, 2021, President Biden was sworn into office. He nominated Merrick Garland to serve as Attorney General.  At his confirmation hearing, Attorney General Garland noted that President Biden is opposed to the federal death penalty and that the Attorney General expected the President to give guidance on the federal death penalty, likely directing a return to a moratorium. *See* C-Span, Video of Attorney General Confirmation Hearing, Day 1, (Feb. 22, 2021), https://www.c-span.org/video/?508877-1/attorney-general-confirmation-hearing-day-1 (Attorney General answering question by Senator Patrick Leahy at 2:16 to 2:18:54).

**2. The ACLU's FOIA requests and the Subsequent History**

In the wake of the *Hartkemeyer* suit and the first three federal executions, the ACLU

submitted a FOIA Request to Defendant BOP seeking the release of COVID-19 data and cost

and staffing information related to carrying out the federal executions. Stubbs Decl. ¶ 4; Stubbs

Decl. Ex. 1 (FOIA request). Plaintiffs sought expedited processing in light of the upcoming

executions. *Id*. By email dated August 7, 2020, BOP acknowledged receipt of the Request,

assigned it reference number 2020-06027, and stated that the "request meets the requirements to

be processed on an expedited basis."  Stubbs Decl. Ex. 2 (BOP Grant of Expedited Processing).

BOP noted, however, that processing may take six months or more. *Id*.

The ACLU filed its complaint on August 21, 2020, and filed an application for a

temporary restraining order on August 24, 2020, seeking immediate production of a limited set

of records. The Court denied the temporary restraining order but granted in part a preliminary

injunction filed by the Plaintiffs on August 28, 2020. BOP ultimately produced documents on

five separate dates: (1) September 18, 2020 (some redacted COVID-19 testing and contact

tracing data); (2) October 16, 2020 (redacted COVID-19 data); (3) October 22, 2020 (redacted

COVID-19 staff positive case forms and cost information); (4) November 13, 2020 (redacted

contract cost data and ventilation maintenance reports); (5) December 7, 2020 (redacted budget

information); and (6) January 7, 2021 (redacted personnel check-ins and rosters from execution

teams and additional budget data).

The ACLU published much of the FOIA data on its website and wrote press advisories,

blogs, and social media alerts about the revelations from BOP's disclosure. *See generally*,

ACLU, *Federal Executions in the Time of COVID-19*, https://www.aclu.org/other/federal-

executions-time-covid-19 (posting FOIA documents along with links to select news articles,

blogs and letters).[4] Counsel in the *Smith v. Barr* litigation used the records obtained from the FOIA suit as part of their successful efforts to litigate for additional COVID-19 precautions at FCC Terre Haute in advance of the January 2021 executions. *See Smith v. Barr*, No. 2:20-cv-630-JMS, 2021 WL 71168 (S.D. Ind. Jan. 7, 2021), ECF Nos. 13-27 and 13-28 (Declaration by Cassandra Stubbs with BOP FOIA excerpts).

Journalists reported extensively about the revelations regarding the inadequate COVID-19 precautions and the likely spread of disease from carrying out the federal executions. *See, e.g.,* Emma Grey Ellis, *Federal Executions During COVID-19 put Innocent Lives at Risk*, Wired, (Sept. 24, 2020), https://www.wired.com/story/federal-executions-covid-19/.[5] Reporters also published stories dedicated to describing the cost data uncovered from the FOIA documents. *See*

---

[4] *See also*, ACLU Press Release, *FOIA Data Reveal Inadequate Testing and Precautions, Followed by COVID-19 Outbreak and Deaths*, Sept. 21, 2020, https://www.aclu.org/press-releases/bop-data-show-federal-executions-likely-caused-covid-19-spike; Henderson Hill, *New Data Connect the Federal Executions and a COVID-19 Outbreak in Indiana*, ACLU, (Sept. 22, 2020), https://www.aclu.org/news/capital-punishment/new-data-connect-the-federal-executions-and-a-covid-19-outbreak-in-indiana/; ACLU Press Release, *ACLU Statement on the 13th and Final Federal Execution*, (Jan. 16, 2021), https://www.aclu.org/press-releases/aclu-statement-13th-and-final-federal-execution; Cassandra Stubbs, *Atrocities of the Federal Death Penalty*, ACLU, (Feb. 2, 2021), https://www.aclu.org/news/capital-punishment/atrocities-of-the-federal-death-penalty/; ACLU (@ACLU), *In the middle of a pandemic, this administration decided to resume federal executions for the first time in 17 years. These are the consequences*. Twitter. (Oct. 24, 2020), https://twitter.com/ACLU/status/1320139006013833216. ACLU (@ACLU), *The unprecedented federal executions being carried out by the Trump Administration aren't just reckless and inhumane. They're also costing taxpayers at least $900,000 per death, according to reports we uncovered*. Twitter, (Jan. 9, 2021), https://twitter.com/ACLU/status/1348065269487435776.

[5] *See also,* Nathalie Baptiste, *The Trump Admin's Execution Spree May Have Caused a Coronavirus Outbreak*, Mother Jones, (September 21, 2020), https://www.motherjones.com/crime-justice/2020/09/the-trump-admins-execution-spree-may-have-caused-a-coronavirus-outbreak/; DPIC, *ACLU: Documents Show Federal Executions Likely Caused Prison COVID-19 Outbreak*, (Sept. 22, 2020), https://deathpenaltyinfo.org/news/aclu-documents-show-federal-executions-likely-caused-prison-covid-19-outbreak; Emma G. Ellis, *Federal Executions During Covid-19 Put Innocent Lives at Risk*, Wired, https://www.wired.com/story/federal-executions-covid-19/; Jessica Shulberg, *The Trump Administration is Rushing to Execute People in the Middle of a Pandemic*, HuffPost, (Sept. 24, 2020), https://www.huffpost.com/entry/trump-federal-execution-pandemic5f6bdc2ac5b674713cc71873; Jessica Constant and Annika Russell, *COVID-19 on Death Row*, ABA, (Oct. 30, 2020), https://www.americanbar.org/groups/committees/death_penalty_representation/publications/project_blog/covid-19-on-death-row/; Jon Webb, *COVID: There May be Another Source of Infections in Indiana – Federal Executions*, Courier & Press, (Dec. 8, 2020), https://www.courierpress.com/story/opinion/columnists/jon-webb/2020/12/08/covid-aclu-says-federal-executions-could-bring-infections-indiana/6482213002/; Nathalie Baptiste, *How Trump's Rush to Execute Inmates is Spreading COVID, Mother Jones* (Dec. 8, 2020), https://www.motherjones.com/crime-justice/2020/12/how-trumps-rush-to-execute-inmates-is-spreading-covid/.

Joe Davison, *President Trump's Expensive Death Penalty Binge Could Continue Next Week*,

Wash. Post, (Jan. 9, 2021), https://www.washingtonpost.com/politics/trump-death-penalty-

costs/2021/01/08/63aa3fe0-5120-11eb-b2e8-3339e73d9da2_story.html. Keri Blakinger and

Maurice Chammah, *A $6,300 Bus. A $44 Last Meal. What New Documents Tell Us About*

*Trump's Execution Spree*, The Marshall Project, (Jan. 14, 2021),

https://www.themarshallproject.org/2021/01/14/a-6-300-bus-a-33-last-meal-what-new-

documents-tell-us-about-trump-s-execution-spree; Khaleda Rahman, *Trump Admin Spent*

*Millions Carrying Out Federal Executions In a Pandemic*, Newsweek, (Jan. 14, 2021),

https://www.newsweek.com/trump-admin-spent-millions-carrying-out-federal-executions-

pandemic-1560496.

      The December 7, 2020, disclosures included a heavily-redacted budget document related

to the institutions that had sent federal staff to attend the executions. ECF No. 28, Ex. 2.

Defendants redacted the names of the regions, the institutions, and the total obligation (cost)

information, asserting that those were protected exemptions from disclosure under 6, 7(C) and/or

(7)F. ECF No. 28, Ex. 1. Plaintiff challenged those redactions and sought a hearing on the

matter. ECF No. 28. At the initial hearing, counsel for Defendants argued that disclosing the

names of the institutions could allow someone to investigate and uncover the identity of

individuals who participated in the executions. Stubbs Decl., Ex. 6 (Dec. 9, 2020 Transcript pp.

5-6). Defense counsel acknowledged that this argument required evidentiary support and she

stated her intent "to develop further and support with declarations from BOP personnel at the

motion for summary judgment phase." *Id*. at p. 8.  The Court determined that it would need

additional information in order to evaluate whether disclosing the names of institutions would

put any individual at risk of exposure. *Id*. at 18, 24.  At a subsequent hearing on January 5, 2021,

Rick Winter, regional counsel for BOP, testified about his desire to protect any individual from disclosure. He conceded, however, that no threats had actually been made related to the federal executions; that he was unaware of any threats to the FCC Terre Haute Warden; and that he had not been subjected personally to any harassment or threats. Stubbs Decl. ¶¶ 10-12. Mr. Winter further conceded that anyone truly motivated to attempt to uncover the identity of individuals who participated in the executions could look for staff who were out of the office during the weeks of the executions since BOP generally prohibited all staff travel at that time. *Id.* On January 5, 2020, the Court ordered disclosure of the withheld names of institutions, although it did not order BOP to disclose the numbers of individuals participating from each facility. ECF No. 35. BOP made that disclosure on January 7, 2021.

These cross-motions for summary judgment followed.

## LEGAL STANDARD

The Freedom of Information Act requires disclosure unless records fall within one of the nine enumerated exemptions. 5 U.S.C. § 552(b). Courts must construe those exemptions narrowly. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (FOIA exemptions "must be narrowly construed" and "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act"); *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *cf. DOS v. Ray*, 502 U.S. 164, 173 (1991) (noting FOIA "was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny") (internal quotation marks omitted). "[T]he burden is on the agency to show that requested material falls within a FOIA exemption." *Burka v. HHS*, 87 F.3d 508, 514 (D.C. Cir. 1996) (quotation marks and citation omitted); *see also DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) ("Unlike the review of other agency action that must be upheld if supported by substantial

evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action.'") (quoting 5 U.S.C. § 552(a)(4)(B)).

An agency claiming an exemption must explain why the exemption applies clearly and explicitly. *See Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1985) (agencies must "describe the justifications for nondisclosure with reasonably specific detail [and] demonstrate that the information withheld logically falls within the claimed exemption," with declarations "not controverted by either contrary evidence in the record nor by evidence of agency bad faith") (internal quotation marks omitted).

For any documents withheld as exempt, the withholding agency must also demonstrate that disclosure would result in foreseeable harm—i.e., agencies may withhold information "only if . . . (I) the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption . . .; or (II) disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). Thus, "'an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest' and if the law does not prohibit the disclosure." *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019) (quoting *Rosenberg v. DOD*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018)). "[T]he foreseeable-harm requirement impose[s] an independent and meaningful burden on agencies," which is "intended to restrict agencies' discretion in withholding documents under FOIA." *Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (internal quotation marks and citation omitted) (second bracket in original).

FOIA disputes are typically resolved at the summary judgment stage. *See Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011) ("[V]ast majority of FOIA cases can be resolved on summary judgment."). Summary judgment is appropriate where

15

"the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Responses to FOIA requests are reviewed *de novo*. 5 U.S.C. § 552(a)(4)(B).

## ARGUMENT

### I.    Many of BOP's Factual Assertions Are Not Supported by Admissible Evidence.

Fed. R. Civ. P. 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." As a threshold matter, BOP's motion is defective on its face, because its factual support for the invocation of exemptions is inadequate and rests on a declaration that fails to satisfy any of these requirements.[6]

BOP relies exclusively upon the declaration of Kara Christenson, a FOIA specialist and paralegal. ECF 38-4, ¶ 1. In the first section of Ms. Christenson's declaration, Ms. Christenson describes her search for appropriate records, matters within her training and expertise as a FOIA specialist. *See* ECF 38-4, pp. 5-13. For the application of exemptions, however, Ms. Christenson makes unsupported factual assertions regarding BOP's negotiations with third parties and speculation, the availability of sources of pentobarbital, and claims of "doxing" of suppliers of lethal injection drugs. ECF 38-4, ¶¶ 31-69. Ms. Christenson's declaration is too thin a reed to support the sweeping asserted facts she asks this Court to accept in order to approve of the withholding of documents.

---

[6] A motion to strike Ms. Christenson's declaration on account of these defects will be filed shortly. *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93, 97 n.5 (D.C.Cir.1995).

With respect to negotiations, Ms. Christenson states that contractors "were assured that their identifies will not be disclosed," ECF 38-4, ¶ 38 and that individuals or companies providing the contract have "expressly required or requested that the Government maintain the information as confidential to the greatest extent possible under the law." ECF 38-4 ¶ 31. Ms. Christenson provides no explanation of the source or basis of these purported facts. Ms. Christenson is not a subject matter expert for BOP. Nor does she claim to have personal knowledge of all of these supposed facts. *See* ECF 38-4, ¶ 3. Her declaration falls far short of the requirement of personal knowledge imposed by Rule 56(e). *See Londrigan v. FBI,* 670 F.2d 1164, 1174 (D.C.Cir.1981) ("[Rule 56(e)'s] requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented."); *Schoenman v. FBI*, 575 F. Supp. 2d 166, 172 (D.D.C. 2008) (FOIA agent can attest to observations based on review of documents without independently verifying those facts, but cannot attest to impressions of conversations the agent did not overhear or observe). In *Londrigan*, the Government attempted to reply on a FOIA supervisor's generalized claims that individuals interviewed by the FBI were protected by "implied confidentiality," where interviewed individuals assumed that they shared would be kept confidential. 575 F. Supp. 2d at 1167. The Court of Appeals found the affidavit insufficient and incompetent because the affiant made assertions beyond his review of the documents or agency procedures of which he possessed personal knowledge. *Id.* at 1175. The Court suggested the government would likely need to obtain affidavits from those individuals who interviewed the witnesses in order to meet its burden of showing an exemption. *Id*. at 1174 n.47.[7] This Court

---

[7] While some district courts have accepted hearsay evidence in FOIA cases in affidavits, those are limited to the information in recounting searches. *See e.g. Canning v. DOS*, 134 F. Supp. 3d 490, 510 (D.D.C. 2015); *Shapiro v. DOJ*, 37 F. Supp. 3d 7, 20 (D.D.C. 2014).

should not accept Ms. Christenson's vague and unsupported factual assertions of negotiations that she lacks personal knowledge to support.

Ms. Christenson's statements that disclosure of the requested records runs a serious risk of "doxing" suppliers of lethal injection drugs and that companies are "commonly" subject to harassment and threats are entirely based on hearsay media articles and are also beyond her personal knowledge.  ECF 38-4, ¶¶ 31-39. This portion of Ms. Christenson's declaration reads like a legal brief: argument with citations to published articles, an obscure internet blog post from 2013, and legal cases. It does not set out any other factual basis for the conclusions of threats and harassment. Indeed, one of the articles Ms. Christenson cites show the exact opposite of her claim: an FBI investigation into supposed threats against a pharmacist in the wake of disclosures that the pharmacist had provided drugs to be used in an execution revealed that no such threat had been made. ECF 38-21, Chris McDaniel, *FBI Documents Don't Back Up Claimed Threat to Execution Drug Supplier,* BuzzFeed, (Aug. 29, 2016), https://www.buzzfeednews.com/article/chrismcdaniel/fbi-documents-dont-back-up-claimed-threat-to-execution-drug.  Another news story included in the declaration confirms that drug companies were suing because prison officials had attempted end runs around their distribution control agreements in an attempt to use their drugs in executions over their wishes. ECF 38-20, Mark Berman, *Drug Companies Don't Want to Be Involved in Executions, So They're Suing To Keep Their Drugs Out*, Wash. Post, (Aug. 13, 2018), https://nationalpost.com/news/world/drug-companies-dont-want-to-be-involved-in-executions-so-theyre-suing-to-keep-their-drugs-out. The companies who were the targets of "harassment" were the subjects of public reporting because of lapses in their own safety records. *See, e.g.*, Chris McDaniel, *Inmates Said the Drug Burned as They Died. This is How Texas Gets Its Execution Drugs*, Buzzfeed News, (Nov. 28,

2018), https://www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas (Greenpark Compounding Pharmacy had history of safety violations); Chris McDaniel, *Missouri Fought for Years to Hide Where it Got Its Execution Drugs. Now We Know What They Were Hiding,* Buzzfeed, (Feb. 28, 2018) (reporting on Foundation Care, a compounding pharmacracy with a checkered safety history). The Government has no interest in shielding from the public poor safety records of companies involved in executions.

## II.      Defendant Is Improperly Withholding Information Under Exemption 4

Defendant BOP seeks to withhold a large number of disclosable records and information under Exemption 4, including records of the amounts that BOP paid for execution drugs and services, the identities of the companies and contractors who provided the drugs or critical services, and information that it contends could "lead" to the identification of those entities, including information about the quality of those drugs. Christenson Decl. ("Decl.") ¶¶ 28-30.

Exemption 4 shields from disclosure "trade secrets and commercial or financial information" 5 U.S.C. § 552(b)(4). When trade secrets are not at issue, Exemption 4 applies if the information in question is shown to be both "commercial or financial" and "privileged or confidential." *Pub. Citizen Health Res. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). However, "not every bit of information submitted to the government by a commercial entity qualifies for protection," *id.* at 1290, which is consistent with the core tenant and basic purpose of FOIA "to ensure an informed citizenry … and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

BOP has not met its burden of establishing the requirements of these exemptions.  It fails to show that the identities of the companies who provided equipment, critical services, and lethal

injection drugs are "commercial or financial information." It further fails to show that the withheld information about costs, purchase dates, contract terms, quality of drugs, and/or the identifies of suppliers of drugs and services as qualifies as "confidential."

### A. Identities of companies who provided supplies, critical services, and pentobarbital are not commercial or financial information.

BOP withheld documents and information that "could lead to the identity" of companies providing lethal injection drugs, medical supplies, equipment, or services in the federal executions. Christenson Decl. ¶¶ 29-30. However, the identity of the entities that provided critical services related to the execution and pentobarbital do not qualify as commercial or financial information and therefore do not fall under Exemption 4.

Courts have repeatedly ruled that identities are not commercial or financial information for purposes of Exemption 4. *See Pub. Citizen v. HHS*, 975 F. Supp. 2d 81, 105-06 (D.D.C. 2013) (finding that neither names of persons employed by the company nor the identity of the outside agency investigating the companies was commercial information); *Hodes v. HUD*, 532 F. Supp. 2d 108, 117-18 (D.D.C. 2008) (rejecting application of Exemption 4 to identity of companies involved in Government National Mortgage Association's mortgage-backed securities program); *see also Comptel v. FCC,* 910 F. Supp. 2d 100, 116 (D.D.C. 2012) ("Names clearly are not financial information … [and] it is not a certainty that a corporation would have a commercial interest in the names of every one of its employees."); *cf. Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) ("easily" finding that "revenue, net worth, income, and EBITDA," were financial and commercial information).

In *Public Citizen*, the Department of Health and Human Services cited Exemption 4 to withhold, among other items, the identity of government agencies conducting investigatory or legal proceedings against two pharmaceutical companies. 975 F. Supp. 2d at 105. The court

acknowledged that "revealing the existence of an investigation, even if the status is closed, may be embarrassing or harmful to the reputation of a company," but concluded that this alone did not transform an identity into commercial information. *Id*.

Despite this clear guidance, and the ordinary meanings of the terms financial and commercial,[8] BOP nevertheless seeks to extend the confines of Exemption 4, well beyond what was anticipated, to "every aspect of the company's trade or business, which is 'plainly incorrect.'" *Pub. Citizen*, 975 F. Supp. 2d at 100–01.

To bolster its expansive interpretation, BOP relies on *Gellman v. Dep't of Homeland Sec.* and *Electronic Privacy Info. Ctr. v. Dep't of Homeland Sec. ("EPIC")*. MSJ at 13. The former is wholly irrelevant to the question whether identities are financial or commercial information as it instead analyzes whether the manner in which a company "formats, designs, and organizes its product" constitutes commercial information under Exemption 4. *Gellman v. Dep't of Homeland Sec.*, No. 16-CV-635 (CRC), 2020 WL 1323896, at *10 (D.D.C. Mar. 20, 2020).

*EPIC* likewise fails to support the application of Exemption 4 in this case as its circumstances are unique. It is true that *EPIC* concluded that the identities of companies that participated in a cyber-security pilot program conducted by the Departments of Defense and Homeland Security were commercial information. However, in making this ruling, Judge Kessler was clear that a "company may not always have a commercial interest in its name and identity" and that her ruling applied only "in this particular context." *EPIC*, 117 F. Supp. 3d at 62-63. This context-specific finding of a commercial interest relied on the reasoning that publicly

---

[8] *See Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 35 (D.D.C. 2011) (finding that the terms financial and confidential in Exemption 4 are to be given their ordinary meaning); *see also Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (defining commercial as "basic commercial operations or … the income-producing aspects of a business").

highlighting which companies applied for additional cyber protection, could result in "increased cyber targeting" and could be "viewed as admi[tting] cyber vulnerability," which could in turn lead to competitive disadvantages or commercial loss. *Id*. at 64.

Conversely, in this case, the sole competitive harm on which the government relies is a vague allusion to "controversy" and a "firestorm of criticism." MSJ at 13. First, this passing reference to possible injury is insufficient to establish a commercial interest such as that evidenced in *EPIC*. *See Pub. Citizen*, 975 F. Supp. 2d at 107 (finding insufficient a bare assertion that the release of information would "cause competitive harm or be of some use to 'adversaries in current litigation.'"). Second, the "law is well-settled that this potential consequence of a disclosure does not convert the information into 'commercial' under Exemption 4." *Id*. at 107. Accordingly, the government's speculations about reputational damage are not sufficient to convert the identity of a vendor, contractor, or supplier into a "commercial interest." *See EPIC,* 117 F. Supp. 3d at 62-63; *see also Washington Research Project, Inc. v. U.S. Dep't of Health, Educ. and Welfare,* 504 F.2d 238, 244 (D.C. Cir. 1974) ("[T]he reach of the exemption for 'trade secrets or commercial or financial information' is not necessarily coextensive with the existence of competition in any form.").

### B.  BOP improperly withheld information under Exemption 4 that is not confidential.

In order to qualify as confidential, information must both be "customarily and actually treated as private." *Food Mktg. Instit. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019). BOP has failed to show that withheld information about price and fees, identities of the suppliers, and contract terms information was actually treated as private, because it relies only on the declaration of Ms. Christenson, who lacks any personal knowledge of agreements made about the designation or treatment of this information. *See supra*, Argument I.

BOP has also failed to show that the information is customarily treated as private. BOP does not contend that the withheld information – e.g., product descriptions, contract prices, names of medical supplies companies or compounding pharmacies - are customarily treated as private in the medical industry.  Instead, BOP attempts to argue that this broad range of information should be deemed as "customarily" treated as private because of the context here: association with controversial executions. MSJ at 15. This argument fails.

BOP's assertion that information is customarily treated as private because third-party contractors are "well aware that those involved in the execution process (at the state or federal level) are commonly subject to harassment, threats, and negative publicity," Decl. ¶ 32, is insufficient, even apart from Ms. Christenson's lack of personal knowledge.  "Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury." *United Techs. Corp. v. DOD*, 601 F.3d 557, 564 (D.C. Cir. 2010); *see also Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 341 (D.C. Cir. 1989) (holding that a submitter's "right to an exemption, if any, depends upon the competitive significance of whatever information may be contained in the documents, not upon whether its motive is to avoid embarrassing publicity"); *CNA Fin. Corp. v. Donovan,* 830 F.2d 1132, 1154 (D.C. Cir. 1987) (noting that "unfavorable publicity" for a corporation does not warrant withholding material under Exemption 4).

Moreover, evidence in the record shows that Ms. Christenson's claims of threats or harassment are exaggerated. When subject matter expert Rick Winter testified at the hearing before this Court, he conceded that BOP had in fact received no threats related to the ten executions that had been carried out to date.[9] Similarly, although BOP deployed an entire 50-person specialized armed team in anticipation of protests, the only protestors were small groups

---

[9] Plaintiffs have requested the official transcript from this hearing and will provide it in a supplemental filing on Monday April 26, 2021.

of peaceful individuals. *See, e.g.,* Liliana Segura, *After Trump's Execution Spree, Lingering Trauma and A Push for Abolition*, The Intercept (Feb. 6, 2021), https://theintercept.com/2021/02/06/execution-trump-death-penalty-abolish/. BOP ultimately abandoned its plans to bring the SORT and DCT teams to the executions.  Stubbs Decl. Ex. 4 (Watson Decl. ¶ 18).

The media previously reported about a Congressional investigation in July, 2020 into the suspected supplier of the lethal injection drugs, Absolute Standards, Inc. *See* Jonathan Allen, *U.S. Lawmakers Ask Four Companies about Role in Government's Execution Drugs*, Reuters, (July 14, 2020), https://www.reuters.com/article/uk-usa-executions-drugs-idUKKCN24F2NT. As BOP notes, Reuters reported about the involvement of three companies in testing the drugs. *Id*; ECF 38-18 (July 10, 2020 Reuters article). BOP points to no instances of harassment or threats in the wake of those media disclosures and no explanation for why disclosure now would result in new harm to the companies. *Cf., Ctr. For Auto Safety v. DOT*, 133 F. Supp. 3d 109, 135-36 (D.D.C. 2015) (noting that the information protected has already been revealed to the public it undermines claims of competitive harm or injury).

  *1.  BOP Fails to Show that Price and Cost Information Are Confidential*

BOP applied Exemption 4 to withhold "negotiated prices and fees … invoices and vendor payment forms." Decl. ¶¶ 29-30. This information is not confidential. Courts in this Circuit have repeatedly ordered that costs, fees, and contract terms are public information. *See, e.g., Associated Press v. FBI*, 265 F. Supp. 3d 82, 102 (D.D.C. 2017) (finding that the purchase price paid to a vendor was not "confidential within the meaning of Exemption 4"); *Racal-Milgo Gov't Sys., Inc. v. Small Bus. Admin.*, 559 F. Supp. 4, 6–7 (D.D.C. 1981) (ordering disclosure of unit prices for leased and purchased equipment from a private company to the government after

determining "exemption 4 shielded information much more sensitive than mere prices"); *see also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,* 375 F.3d 1182, 1191–92 (D.C. Cir. 2004) (finding no viable claim that release of hourly rates for "above and beyond" work would place the company at a competitive disadvantage). Similarly, the "invoices and vendor payment forms … withheld in full," Decl. ¶ 30, are not shielded under Exemption 4. The "[D.C.] Circuit has expressed a strong reluctance to protect total contract prices under exemption 4." *Hodes v. U. S. Dep't of Treasury*, 342 F. Supp. 3d 166, 173 (D.D.C. 2018) (collecting cases).

In addition to citing the possible reputational effects, Defendant allots a single sentence to argue that disclosure of this information might also harm "such individual's and company's competitive business interests." MSJ at 15. However, this argument fails because any information on prices paid to contractors and suppliers before and during the summer of 2020 is now stale and any resulting harm would be minimal. *See Biles v. HHS*, 931 F. Supp. 2d 211, 227 (D.D.C. 2013) (finding that the requested information was not confidential where the government failed to show how historical cost data was still commercially valuable); *see also JCI Metal Prods. v. U.S. Dep't of the Navy,* No. 09-CV-2139 IEG (AJB), 2010 WL 2925436, *7 (S.D. Cal. July 23, 2010) ("[A]ny resulting competitive harm to JCI from the release of this 'stale' information would be minimal."). Information about contract prices and payments made to individuals or companies in preparation for executions that have already concluded are of limited use to any contractors' competitors. *See Boeing Co. v. Dep't of Air Force*, 616 F. Supp. 2d 40, 49 (D.D.C. 2009) (upholding the agency's determination that past rates were not properly withheld under Exemption 4). In contrast, releasing this information would greatly expand the public understanding of how taxpayer funds are expended when the government undertakes the very serious business of executing human beings.

2. *BOP fails to show that identities or the information that could lead to them are confidential information.*

As noted above in Section A, the identities of companies providing services or supplies are not commercial. Assuming, arguendo, that identities are commercial information, they are nonetheless not confidential information. *See Hodes*, 532 F. Supp. 2d at 119 (finding that identities of companies involved in Government National Mortgage Association's mortgage-backed securities program were not confidential information under Exemption 4).[10] BOP has failed to meet its burden of showing the identities of the companies are confidential.

Despite BOP's representations that the confidential nature of identities of companies is well established, MSJ at 15, this is in fact an open question, currently pending in two other suits in this district. *See Citizens for Resp. & Ethics in Wash. v. DOJ*, No. 19-cv-03626-DLF (D.D.C.); *Buzzfeed v. DOJ*, 18-cv-1556-TSC (D.D.C.). As the government and suppliers of lethal injection drugs are undoubtedly aware, citizens have successfully used public record laws to request documents with the identities of the suppliers of drugs used in executions for decades.[11] BOP is

---

[10] Exemption 4 "does not protect *all* financial or commercial data" but only "*confidential* commercial or financial information." *Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986).

[11] *See, e.g., Indiana Dep't of Corr. v. Toomey*, 162 N.E.3d 1099 (Ind. 2021)(upholding in a split opinion the trial court's ruling that Indiana Department of Correction was required to release the identity of drug suppliers); *Nebraska ex rel. BH Media Grp., Inc. v. Frakes*, 305 Neb. 780, 802 (2020) (rejecting the state's argument that the identities of suppliers of lethal injection drugs must be shielded from disclosure and finding no evidence that disclosing the identity of a supplier would in turn lead to the disclosure of the identity of an execution team member); *Cover v. Idaho Bd. of Corr.*, 476 P.3d 388, 397-98 (Idaho 2020)(finding that the Department was not permitted to withhold a form identifying pharmacy which provided drugs for execution or confidential cash log); *Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668, at *7–8 (D. Ariz. Oct. 7, 2013) (finding no evidence that the manufacturer's identity could be gleaned from the expiration date or lot number of the pentobarbital and that regardless the state's withholding of identity was " an exaggerated response to their asserted penological justification."); *Am. Civil Liberties Union of N. California v. DEA*, No. C 11-01997 RS, 2011 WL 13243729, at *13 (N.D. Cal. Oct. 28, 2011)( "defendant is ordered to disclose the identity of the sodium thiopental supplier and quantity imported on the internal DEA email"); *Am. Civil Liberties Union of N. California v. CDCR*, No. CIV 1504195 (Super. Ct. Mar, 21, 2016) (ordering disclosure of over 800 documents including possible sources of lethal injection drugs); *But see Tex. Dep't of Criminal Justice v. Levin,* 572 S.W.3d 671, 673 (Tex. 2019) ("disclosing the source's identity would create a substantial threat of physical harm to the source's employees and others, and therefore need not be disclosed.").

unable to demonstrate that this information is customarily treated as private and has not met the requirements of Exemption 4.

Further, even if identities constituted confidential information, Exemption 4 would still not apply to the sweeping withholdings made to information that purportedly could *lead* to these identities, including: "substance descriptions, quantity, concentration, and dates of purchase." Decl. ¶¶ 29-30. This information, like concentration of the drugs and purchase dates, are not "customarily and actually treated as private," *Argus*, 139 S. Ct at 2366, and BOP does not argue that this information is confidential in and of itself. Instead, it attempts to create a new category of items for withholding: information that, if disclosed, could lead to the identification of information subject to the exemption. It offers no legal support for such an expansive interpretation of the statute and it fails to make a persuasive factual showing that disclosure of items like the dates of purchase would actually place the identity of the compounder or supplier at risk of disclosure. BOP rests its arguments about the risks here on conjecture alone: what highly motivated individuals theoretically could attempt to piece together. *See e.g.,* Christenson Decl. ¶¶ 59-61. This Court has already grappled with similarly attenuated arguments in this case and rejected the defendants' redactions of the names of facilities from which BOP employees had traveled in order to participate in the executions because there was no reason to believe that such information would, in fact, result in the identification of specific individuals. *See* Order, *Am. Civil Liberties Union v. BOP*, 1:20-cv-02320-RBW (D.D.C. Jan. 5, 2021). The government's argument that the names of those facilities alone could be used to identify individuals who took part in the executions fell short then, just as its arguments that descriptions of products or purchase dates could lead to identities falls short now. *See WP Co. LLC v. U.S. Small Bus. Admin.*, No. CV 20-1240 (JEB), 2020 WL 6504534 (D.D.C. Nov. 5, 2020) (rejecting

as "bare speculation" the government's argument to withhold loan data, which was not itself

confidential, because it might reveal confidential payroll information and concluding that

Exemption 4 did not apply). BOP's conjecture is therefore insufficient to meet its burden under

Exemption 4.

Finally, BOP's overly broad application of Exemption 4 is contrary to the expressed will

of Congress. Congress and other legislatures have enacted laws shielding corporate identities

where they believed circumstances justified such protection. *See, e.g.*, 50 U.S.C. §§ 3121-3122

(protecting the identities of covert agents); *see also* Ark. Code Ann. § 5-4-617(h)(i)(1)(B), Miss.

Code. Ann. § 99-19-51(6)(c), Tex. Crim. Proc. Code Ann. art. 43.14(b)(2) (state statutes ordering

the identity of entities that participate in their lethal injection processes to be kept confidential).

Congress could have legislated similar protections to shield the identities of contractors who

provide goods and services to the federal government, but it has not. Instead, it has pointed in the

opposite direction, highlighting the importance of "visibility into who is receiving Federal funds

through contracts and grants, and for what purpose." S. Rep. No. 109-329, at 3 (2006) (report

accompanying Federal Funding Accountability and Transparency Act of 2006); *see also Wash.

Post Co. v. HHS*, 690 F.2d 252, 264 (D.C. Cir. 1982) ("[T]he purpose of FOIA is to permit the

public to decide for itself whether government action is proper.").

For these reasons, Exemption 4 does not justify the withholding of this non-confidential

information. Release of this information would serve the public interest while causing no harm.

**III.    Defendant Is Improperly Withholding Information Under Exemption 7.**

In order to demonstrate that Exemption 7 permits the withholding of documents the

government must establish that: (1) that the requested documents were "compiled for law

enforcement purposes," 5 U.S.C. § 552(b)(7), and (2) that release of the material would cause

one of the "six specific harms" specified in the Act. *FBI v. Abramson*, 456 U.S. 615, 622 (1982).

Applying these criteria, the defendants fail to show that Exemptions 7(A), 7(C), 7(E), or 7(F)

apply to the withheld records. MSJ at 18-31.

### A. The withheld records were not compiled for law enforcement purposes

Defendant has failed to establish the initial fact required by Exemption 7, that the

documents in question were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7).

"Documents are compiled for 'law enforcement purposes' if 'the investigatory activity that gave

rise to the documents is related to the enforcement of federal laws, and there is a rational nexus

between the investigation at issue and the agency's law enforcement duties.'" *Lewis v. Dep't of*

*Treasury*, No. 17-cv-0943 (DLF), 2020 WL 1667656, at *2 (D.D.C. Apr. 3, 2020) (quoting

*Judicial Watch, Inc. v. Rossotti*, 285 F. Supp. 2d 17, 24 (D.C. Cir. 2003)). These two criteria

depend on "how and under what circumstances the requested files were compiled" and "whether

the files sought relate to anything that can fairly be characterized as an enforcement proceeding."

*Id.* (quoting *Jefferson v. DOJ*, 284 F.3d 172, 176-77 (D.C. Cir. 2002)).

The government improperly characterizes documents on cost, numbers of persons

involved in the executions, and information that could possibly lead to the identity of suppliers as

law enforcement documents, arguing they qualify because of BOP's "management of federal

correctional facilities for the safety of inmates, staff, and the community" as well as "its

implementation of a federal criminal sentence." MSJ at 16.  Neither argument transforms these

records into records compiled for law enforcement purposes.

The first categorization, prison management, is inapt on its face for BOP's withholdings

under Exemption 7, including: a) the identities of third-party contractors who provided critical

services related to the execution and pentobarbital; b) descriptions of transactions related to

29

pentobarbital as well as descriptions of the pentobarbital itself; c) price negotiations for goods and services related to the execution and; d) the numbers of individuals involved in the execution. None of these items relates to the management of a correctional facility.

The second characterization on which BOP relies, that the applicable law enforcement purpose is "carrying out the judgment of a sentence of death," Christenson Decl. ¶ 53, likewise falls short. Not all records related to BOP's duties are compiled for law enforcement purposes. *See, e.g.*, *Raher v. BOP*, No. CV-09-526-ST, 2011 WL 2014875, at *9 (D. Or. May 24, 2011) (finding that although "disclosure of information pertaining to 'security electronics,' 'security inspection system,' and staffing vulnerabilities raise security concerns with respect to [BOP's] custodial functions," the agency failed to explain how those documents pertain to law enforcement functions).  Instead, in order to be compiled for a law enforcement purpose there must be "rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law." *Blackwell v. FBI*, 646 F. 3d 37, 40 (D.C. Cir. 2011); *see also Benavides v. BOP*, 774 F. Supp. 2d 141, 146-47 (D.D.C. 2011) (finding that BOP's status as "a law enforcement agency responsible for the welfare of inmates in its custody, its staff, and the public at large" did not warrant a "per se" designation of compiled for law enforcement purposes absent a demonstration of this nexus). The records in question do not relate to an "investigation," nor a "security risk" or "violation of federal law." *Id.* at 40. Rather, they are contracts, invoices, documentation on the suppliers of critical services, and the numbers of people involved in executions. The mere fact that an execution is involved does not convert the largely financial records in question into records "complied for law enforcement purposes." *See Henderson v. DOJ*, 157 F. Supp. 3d 42, 49-50 (D.D.C. 2016) (holding stenographic expense records were not "compiled for law enforcement purposes" when "the apparent connection between stenographic

services and the EOUSA's law enforcement function in prosecuting plaintiff's criminal case"
was "highly attenuated"); *see also Carson v. DOJ*, 631 F.2d 1008, 1018 (D.C. Cir. 1980)
(finding that where an affidavit included descriptions "so cursory" the law enforcement purpose
was left in doubt, Exemption 7(A) could not justify withholding."). Therefore Exemption 7 does
not apply.

## IV. Defendant is Improperly Withholding Material under Exemption 7(A).

Even if this Court determines that the withheld documents were compiled for law
enforcement purposes, the Defendant nonetheless fails to make a showing that disclosure is
prohibited under section 7(A). Exemption 7(A) applies when the disclosure of records "(1) could
reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or
reasonably anticipated." *Citizens for Responsibility and Ethics in Washington v. DOJ*, 746 F.3d
1082, 1096 (D.C. Cir. 2014). An agency may invoke Exemption 7(A) only if an enforcement
proceeding is either "pending or contemplated." *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir.
1993) (quoting *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 870 (D.C. Cir.
1980)). It is not sufficient for the agency to simply assert that disclosure will interfere with
enforcement proceedings or rely on mere speculation; "it must rather
demonstrate *how* disclosure" will do so. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1114
(D.C. Cir. 2007). The government has failed at each step to make the necessary showing for the
records it has withheld under Exemption 7(A). It does not establish that executions or
hypothetical habeas lawsuits are "enforcement proceedings"; it fails to show that executions are
pending or contemplated; and it fails to show how disclosure will interfere with future executions

BOP invoked Exemption 7(A) to protect the following categories of information: 1)
payments to third-party contractors who provided services; 2) information that could lead to the

identity of individuals and companies from whom BOP acquired or contemplated acquiring equipment or supplies; 3) information that could lead to the identification of individuals or companies from whom BOP acquired or contemplated acquiring pentobarbital or drug-related services. Christenson Decl. ¶¶ 55; 60. To support its sweeping withholdings, the government argues that there are two types of enforcement proceedings that could be "endangered by release of the information … first, BOP's imposition of a capital sentence itself, and second, the continuing of [*sic*] death row inmate's legal proceedings through, for example, postconviction challenges." MSJ at 25. However, neither of these two categories qualify as "enforcement proceedings" for purposes of Exemption 7(A).

First, BOP fails to show that an execution qualifies as an enforcement proceeding. The government acknowledges that "no court has yet held that the death penalty is a law enforcement proceeding for purposes of Exemption 7(A)," but nonetheless argues for an expansive reading of the statutory term. MSJ at 25. Such a broad reading conflicts with the Supreme Court's repeated admonition that FOIA exemptions must be "narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 366 (1976) ("[W]e have repeatedly stated that the policy of the Act requires that the disclosure requirements be construed broadly, the exemptions narrowly.") (alteration and quotation marks omitted)).

The Government's effort to rely on *Moorefield v. U.S. Secret Service* for this expansion are unpersuasive. MSJ at 25-26. As *Moorefield* itself recognizes, law enforcement proceedings "can generally be equated with a trial" or adjudicatory proceeding. *Moorefield v. U.S. Secret Serv.*, 611 F.2d 1021, 1024-25 (5th Cir. 1980). A federal execution, following the conclusion of all legal challenges to a prisoner's conviction, certainly falls outside this traditional understanding of the scope of Exemption 7(A). Moreover, *Moorefield* involved facts entirely

distinguishable from those here: an on-going investigation by the Secret Service into an individual who had threatened the life of the President. *Moorefield*, 611 F.3d at 1022. The court in *Moorefield* based its decision on the fact that "the purpose and point" of the Service's investigation had not expired. *Id.* at 1025. Indeed, it explained, "[n]ow that Moorefield has served his term and is at liberty, he presents more of a threat than he did while a federal prisoner." *Id*. Unlike the immediate ongoing threat to national security discussed in *Moorefield*, here, the implementation of the death penalty implicates no ongoing investigation. Executions therefore do not constitute enforcement proceedings under 7(A).

The government also fails to establish that hypothetical and unrelated habeas proceedings or potential lawsuits brought by the suppliers of lethal injection substances are law enforcement proceedings. MSJ at 26-27. The government points to only one case where a court applied Exemption 7(A) to habeas proceedings, *Sarno v. DOJ*, 278 F. Supp. 3d 112 (D.D.C. 2017). However, *Sarno* does not stand for the proposition that all pending or contemplated habeas proceedings are law enforcement proceedings with which the release of records "could reasonably be expected to interfere." In *Sarno*, the court applied Exemption 7(A) because the plaintiff had *active* litigation and the information sought was directly related to the criminal evidence in his case, none of which applies here. *See Sarno*, 278 F. Supp. 3d at 125. The government cites no authority at all to support its argument that the mere possibility of unrelated future habeas or civil lawsuits can qualify as enforcement proceedings with which the release of records "could reasonably be expected to interfere."

The government also fails to establish the second prong of Exemption 7(A), that these proceedings are pending or reasonably anticipated. The government proclaims that "there is no question that proceedings are pending or reasonably anticipated." MSJ at 27. However, the

government's *ipse dixit* does not qualify as proof. As an initial matter, it is far from clear that any additional federal executions will take place in light of the new administration's public commitment to work to end the federal death penalty. *See* Testimony of Attorney General Merrick Garland, *supra*, page 11.[12] No individuals have been scheduled for execution and there is simply to reason to anticipate any executions will be scheduled during this administration. Indeed, the federal government in a separate lawsuit successfully moved to dismiss litigation on the ground that a challenge to future executions "is too tenuous to support jurisdiction as there is no 'reasonable expectation' at this time that a federal execution will be scheduled in the near future." Stubbs Decl. Ex. 5 (Govt. Brief in *Smith*, p. 2). Even if future administrations seek to carry out executions, they will not necessarily seek to do so by lethal injection.[13] The government must do more than point to the possibility of some future proceeding for Exemption 7(A) to apply. Instead, it must state particular information such as "the subject matter of the hypothetical proceedings, the parties involved, when such proceedings might occur, or how the information withheld might be used." *Citizens for Resp. & Ethics in Washington v. DOJ,* 658 F. Supp. 2d 217, 228 (D.D.C. 2009); *see also Carson v. DOJ,* 631 F.2d 1008, 1018 (D.C. Cir. 1980) (concluding that the agency's declaration was too conclusory and lacking in specificity). Further, the government must establish a nexus "between the information withheld and any

---

[12] *See also*, Michael Balsamo, *Biden to End Executions as Government sets 3 More*, AP News (Nov. 21, 2020), https://apnews.com/article/joe-biden-prisons-inaugurations-coronavirus-pandemic-executions-365258989e6be8d7077b2f67d8c3e190 (noting that a spokesperson for Biden said he "is against the death penalty and will work to end its use"); Joe Biden, The Biden Plan for Strengthening America's Commitment to Justice, https://joebiden.com/justice/ (listing "eliminate the death penalty" as part of the Biden-Harris platform).

[13] *See* Manner of Federal Executions Rule, 28 CFR § 26 (2021); Keri Blakinger, *How Biden Can Reverse Trump's Death Penalty Expansion*, Marshall Project (March 12, 2021), https://www.themarshallproject.org/2021/03/12/how-biden-can-reverse-trump-s-death-penalty-expansion (noting that before leaving office the Trump administration instituted "a last-minute rule change that allowed the federal *government* to use firing squads or the gas chamber as a means of execution[]"); Virginia Heffernan, *Trump's executions set a sicko record for the United States*, L.A. Times, (Dec. 11, 2020), https://www.latimes.com/opinion/story/2020-12-11/donald-trump-joe-biden-execution-pardon-lame-duck (similar).

proceedings that [are] ongoing or anticipated." *Id*. No such nexus is established here. The government fails to delineate with any specificity how information such as the amounts of payments made to third parties, payment schedules, or contract negotiations specifically relates to ongoing or reasonably anticipated proceedings.

Finally, the government fails to meet the third criterion of 7(A), as its vague predictions of delays in hypothetical criminal proceedings and "risks to physical safety and commercial relationships posed by disclosure," MSJ at 28, do not rise to the level of a reasonable expectation of interference. *See Citizens for Responsibility and Ethics in Washington*, 658 F. Supp. 2d at 231 (rejecting speculative harm in its analysis of exemption 7(A)). BOP's failure to demonstrate interference and the attenuation of the requested documents from any concrete ongoing or even reasonably predictable proceeding, distinguishes this case from *Sarno*, where the court concluded that release of an individual's criminal case file—including grand jury material, investigative reports, tracking and wiretap information—would implicate any future "prosecution and [the prisoner's] convictions," where the prisoner was engaged in ongoing proceedings. *Sarno*, 278 F. Supp. 3d at 126. Conversely, here, information such as prices for goods and services provided by third party vendors, suppliers of critical services and lethal injection drugs, and descriptions of negotiations and physical attributes of lethal injection drugs would not implicate any ongoing or anticipated "challenge to a conviction." *Id*. Further, the harm *Sarno* highlighted was that agencies might "be *hindered in their investigations* or *placed at a disadvantage when it came time to present their cases in court*." *Id*. (emphases added). In this case, disclosure of the requested information would not in any way "prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to

destroy or alter evidence." *Maydak v. DOJ*, 218 F.3d 760, 762 (D.C. Cir. 2000); *see also*

*Campbell v. HHS*, 682 F.2d 256, 261-62 (D.C. Cir. 1982) (Exemption 7(A) was meant to apply

when the Government's case in court—a concrete prospective law enforcement proceeding—

would be harmed by the premature release of evidence or information not in the possession of

known or potential defendants).

Aside from a passing reference to possible stays and delays, MSJ at 28, the government's

sole attempt to specify an interference relies on a recycled argument that popular pressure may

discourage individuals and companies from contracting with the government should the withheld

information lead to their identities. MSJ at 29. However, as discussed above, much of the

material at issue is too attenuated from the actual identities of the suppliers to pose any concrete

risk. Further, even if the disclosed material might enable someone to deduce the identity of a

person or vendor, the government has failed to support the necessary next step, actual

interference with an enforcement proceeding, with anything other than speculation. This is

insufficient for purposes of Exemption 7(A). *See Citizens for Responsibility and Ethics in*

*Washington v. DOJ*, 658 F. Supp. 2d 217, 231 (D.D.C. 2009) (rejecting speculative harm in its

analysis of exemption 7(A)).

## V.   Defendant is Improperly Withholding Material Under Exemptions 6 and 7(C).

BOP is improperly asserting the application of exemptions 6 and 7(C) for personal

privacy or safety of individuals. *See* MSJ at 18–22; 5 U.S.C. § 552(b)(6) (exempting "personnel

and medical files and similar files the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy"); § 552(b)(7)(C) (exempting "records or information compiled for

law enforcement purposes, but only to the extent that the production of such law enforcement

records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy").

These exemptions are meant to protect only records that would identify and threaten specific individuals. *See DOS v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (Exemption 6 "intended to cover detailed Government records on an individual which can be identified as applying to that individual") (quoting H. R. Rep. No. 1497, 89th Cong., 2nd Sess., 11 (1966)); *Walston v. DOD*, 238 F. Supp. 3d 57, 66 (D.D.C. 2017) (Exemption 6 applies to information which creates a "palpable threat to privacy"); *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1124 (D.C. Cir. 2004) (Exemption 6's "primary purpose is to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information'") (quoting *Wash. Post Co.*, 456 U.S. at 599); *Washington Post Co. v. DOJ*, 863 F.2d 96, 100 (D.C. Cir. 1988) ("The disclosures with which the [Exemption 7(C)] is concerned are those of 'an intimate personal nature' such as marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights, and reputation.") (quoting *Sims v. CIA*, 642 F.2d 562, 574 (D.C. Cir. 1980)).

In contrast to this intended purpose, BOP has claimed privacy and safety exemptions for a wide swath of information, much of which has little or nothing to do with personal information on individuals, and which could not plausibly be used to identify any individuals. For example, BOP has claimed that both exemptions apply to descriptions of payments made by BOP, even where the identities of the payees are also redacted. ECF 38-8, Vaughn Index, pp. 4-9 (entry for records 9, 10, 13, 15, 16). BOP has made no attempt to explain why or how descriptions of payments made, without disclosure of the payee, could constitute personal information, or could plausibly lead to the identification or invasion of privacy of any individual. Further,  BOP has

claimed both exemptions all apply to its Death Row Project quarterly obligations amounts—

totals owed by region. Again, BOP has not offered any explanation as to how regional totals

could possibly implicate personal information at all, let alone information of "an intimate

personal nature." *Id.* BOP has fallen far short of its burden of showing the exemptions apply.

Courts have rejected broader claims for redaction when the individual identities were redacted.

*See Pinson v. DOJ*, 313 F. Supp. 3d 88, 120 (D.D.C. 2018) (concluding that withholding of

names is sufficient to protect the requirement under 7(C) to protect individuals from danger);

*Public Employees for Envtl. Responsibility (Peer), Rocky Mountain Chapter v. EPA.*, 978 F.

Supp. 955, 963–64 (D. Colo. 1997) (court ordered disclosure of manual government argued was

protected because government failed to show how the information would identify participants).

Clearly, the privacy interest at stake with the information just described, if it exists at all,

is extremely weak. Conversely, the interest in disclosure is strong. The public has an obvious

interest in how BOP spends taxpayer money and performs its duties. *See Horowitz v. Peace

Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005) ("The focus of the public interest analysis is the

citizens' right to know what their government is up to") (quoting *DOJ v. Reporters Comm. for

Freedom of the Press*, 489 U.S. 749, 773 (1989)) (internal quotation marks omitted*); Pinson v.

DOJ*, 202 F. Supp. 3d 86, 100 (D.D.C. 2016) (noting the public interest in the "BOP's

performance of its statutory duties"); *Linn v. DOJ*, No. 36-1, 1995 WL 631847, at *8 (D.D.C.

Aug. 22, 1995) (noting that the public has an interest in "knowing how [the BOP] operates").

This is particularly true in the context of the government's killing of its own citizens during a

global pandemic. *See, e.g.*, Nina T. Harawa, *As COVID-19 Flares Behind Bars, Now's Not the

Time for More Terre Haute Executions*, IndyStar (Updated July 11, 2020); Hailey Fuchs,

*Federal Executions to Resume Amid a Pandemic and Protests*, N.Y. Times (June 30, 2020);

Khaleda Rahman, *Federal Execution Planner Tests Positive for Coronavirus As Family of Victim Urge Postponement*, Newsweek (July 13, 2020). Thus, even if the withheld records could disclose private information about identifiable individuals, the mandatory balancing of claimed Exemptions 6 and 7(C) would weigh in favor of disclosure. *Horowitz*, 428 F.3d at 278 (quoting *Rose*, 425 U.S. at 372–73 (courts must balance the private interest against the public interest considering FOIA's purpose to "open agency action to the light of public scrutiny").

## VI.  Defendant is Improperly Withholding Material Under Exemptions 7(F).

BOP similarly claims that FOIA Exemption 7(F) applies to the same information claimed under exemptions 6 and 7(C), including descriptions of payments made by BOP and its Death Row Project quarterly obligations amounts. Exemption 7(F) exempts "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." § 552(b)(7)(F). "In general, [Exemption 7F] has been interpreted to apply to names and identifying information of law enforcement officers, witnesses, confidential informants and other third persons who may be unknown to the requester." *Antonelli v. BOP*, 623 F. Supp. 2d 55, 58 (D.D.C. 2009). Courts "inquire 'whether there is some nexus between disclosure and possible harm," and while they may defer to agency assessments, they only do so "[w]ithin limits," *Miller v. DOJ*, 562 F. Supp. 2d 82, 124 (D.D.C. 2008) (quoting *Linn v. DOJ,* No. 36-1, 1995 WL 631847, at *9 (D.D.C. Aug. 22, 1995), and "the agency must first establish that the information 'logically falls into the exemption claimed.'" *Linn v. DOJ, No. 36-1,* 1995 WL 631847, at *9 (D.D.C. Aug. 22, 1995) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1104 (D.C. Cir. 1982)). Agencies must provide more than mere "conclusory assertions that disclosure will increase the chances that third parties will be harmed in some way" or "unsupported speculation." *Long v. DOJ*, 450 F. Supp. 2d 42, 80 (D.D.C. 2006); *see also, Sanchez-Alaniz v.*

*BOP*, 85 F. Supp. 3d 208 (D.D.C. 2015) (vague and conclusory declaration failed to show necessary connection to threat of harm to employee).

BOP has not provided any justification for withholding descriptions of payments made by BOP (with the payees redacted) or quarterly Death Row Project obligations by region, let alone "describe[d] with sufficient particularity," *Fischer v. DOJ*, 723 F. Supp. 2d 104, 111 (D.D.C. 2010), the danger inherent in the release of such information. Thus, there is nothing to which this Court can even defer. And there is no evident or plausible explanation for how the release of this information could possibly endanger anyone. As the BOP "has not established even a minimal nexus between the specific material withheld and harm to persons," *Linn,* No. 36-1, 1995 WL 631847 at *9., Exemption 7(F) cannot apply.[14]

## VII.    Defendant is Improperly Withholding Material Under 7(E).

FOIA Exemption 7(E) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(7)(E). In order to properly invoke Exemption 7(E), then, the agency must demonstrate that the production discloses "either techniques and procedures for law-enforcement investigations, or guidelines for law-enforcement investigations, that would risk circumvention of the law." *Wisdom v. U.S. Trustee Program*, 232 F. Supp. 3d 97, 127 (D.D.C. 2017).

---

[14]  BOP has also claimed Exemption 7(F) with regard to the names of hotels used by BOP staff during executions. MSJ at 21–22. While BOP has not met its burden of demonstrating how the release of the hotel names would specifically endanger individuals, the public interest in this information is not strong, and thus Plaintiffs do not challenge its withholding.

BOP has claimed that Exemption 7(E) applies to check-in time periods for federal executions and to deployment rosters for BOP staff during federal executions, which include qualifications of staff. Christenson Decl. ¶ 76, 78. However, neither deployment rosters nor check-in time periods are used by BOP for, or related, to prosecutorial or investigatory purposes, as is required by the plain terms of the statute. *See Cowsen-El v. DOJ*, 826 F. Supp. 532, 534 (D.D.C. 1992) ("By its express terms, [subsection 7(E)] authorizes the withholding of information consisting of, or reflecting, a law enforcement 'technique' or a law enforcement 'procedure' if it is 'for law enforcement investigations and prosecutions,' not internal agency policies wholly unrelated to investigations or prosecutions."). These items relate to BOP's implementation of executions, which are not prosecutorial or investigatory in nature. Thus, this information does not qualify for Exemption 7(E).

BOP claims that disclosure of these items "would reveal BOP's techniques and procedures for handling federal executions," MSJ at 24, but it fails to specify how mere qualifications could reveal the intricacies of the manner in which an execution is carried out, as is required. *See Citizens for Responsibility & Ethics in Washington v. DOJ*, 746 F.3d 1082, 1102 (D.C. Cir. 2014) ("[T]he agency must at least provide some explanation of what procedures are involved and how they would be disclosed.").

Finally, even if the check-in time periods and staff qualifications did implicate techniques or procedures or relate to investigations or prosecutions,  BOP has not met its burden of demonstrating that their disclosure would risk circumvention of the law. In essence, BOP argues that such disclosure would impair their security operations. *See* MSJ at 24 (circumvention of the law is risked "by revealing potential vulnerabilities in BOP's ability to respond to emergencies during the federal execution process"). However, "[o]perational challenges . . . do not create or

enhance any risk of circumvention of the law in and of themselves. They may complicate the government's response to or prevention of potential circumventions of the law, and thus indirectly raise the risk of violations, but that interest falls outside the scope of Exemption 7(E), which is trained on the risks that result from the disclosure of information about 'law-enforcement techniques and procedures' that would assist a prospective wrongdoer in planning their misconduct." *Ecological Rights Found. v. U.S. EPA,* No. CV 19-980 (BAH), 2021 WL 535725, at *31 (D.D.C. Feb. 13, 2021) (rejecting agency's argument that 7(E) applies to redacted room locations because "disclosure would pose operational challenges for security"). Further, the disclosure of staff qualifications within deployment rosters cannot, alone, be reasonably expected to risk circumvention of the law in any sense, even operationally. The redacted time periods and deployment rosters therefore fail to meet any requirement of 7(E).

## VIII.   Defendant Failed to Release all Reasonably Segregable Information

Even if an agency can establish that it has properly withheld portions of a document under a FOIA Exemption, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b); *see also Roth v. DOJ*, 642 F.3d 1161, 1167 (D.C. Cir. 2011) (finding that an agency "must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)"); *North v. DOJ*, 774 F.Supp.2d 217, 222 (D.D.C. 2011) (citing *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996)). "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). It is the agency that "bears the burden of demonstrating that withheld documents contain no reasonably segregable factual

information." *Mokhiber v. U.S. Dep't of Treasury*, 335 F. Supp. 2d 65, 69 (D.D.C. 2004) (citing *Army Times Pub. Co. v. Dep't of Air Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993)); *Mead*, 566 F.2d at 260. The agency must explain in detail how the information in question is not reasonably segregable. *See Mead*, 566 F.2d at 261–62.

BOP has failed to meet this burden. BOP claimed Exemption 7(E) "to withhold, in full, deployment rosters." Christenson Decl. ¶ 78. They provide no explanation at all as to why, specifically, the number of people deployed in the executions or their qualifications fall under the claimed exemption, which applies to techniques, procedures, and guidelines, or is not reasonably segregable—let alone provided the necessary detailed justification. *See id.* BOP has not even attempted to explain why, for example, the "unique qualifications of staff" should be withheld, as that information would be valuable to the public but would not, as far as Plaintiffs can imagine, disclose any person's identity. BOP cannot plausibly contend, for example, that the Taliban or the Proud Boys would attack FCI Terre Haute to try to prevent the execution of Lisa Montgomery, if only they knew the number or qualifications of the SORT or the DCT. Thus, BOP has failed to fulfill the longstanding requirement that "agencies . . . provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Id.* The BOP has also failed to "describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Id.* at 261. Instead, they broadly claim that the "exempt information was inextricably intertwined with non-exempt information." Christenson Decl. ¶ 80. This sort of "conclusory" statement is exactly the type of justification that has been rejected by the courts. *See, e.g.*, *Mead*, 566 F.2d at 261.At the very minimum, rosters that had all information redacted other than the headings would still

provide valuable information, by showing the numbers of extra staff involved in the execution process. Therefore, this information must be segregated out and released.

## CONCLUSION

Defendant has failed to carry its burden of showing the application of the statutory exemptions to FOIA and failed to show its separate burden of demonstrating "foreseeable harm" from disclosure of important information to the public interest. This Court should deny the Defendant's motion for summary judgment and grant the Plaintiffs' cross-motion for summary judgment.

Dated:  April 23, 2021

Respectfully submitted,

/s/ *Cassandra Stubbs*
Cassandra Stubbs (Admitted *pro hac vice*)
Henderson Hill (D.C. Bar No. 358378)
Olivia Ensign (Admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
(919) 688-4605
cstubbs@aclu.org
hhill@aclu.org
oensign@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
915 15th Street, NW, 2nd floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

*Attorneys for Plaintiffs*