UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   Civil Action No. 20-2320 (RBW) |
| FEDERAL BUREAU OF PRISONS, | ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

The plaintiffs, American Civil Liberties Union and American Civil Liberties Union

Foundation (collectively, the "plaintiffs"), bring this civil action against the defendant, the

Federal Bureau of Prisons (the "Bureau"), pursuant to the Freedom of Information Act (the

"FOIA"), 5 U.S.C. § 552.  See generally Complaint for Injunctive and Declaratory Relief

("Compl."), ECF No. 1.  Currently pending before the Court are (1) the Defendant's Motion for

Summary Judgment ("Def.'s Mot." or the "defendant's motion"), ECF No. 38, and (2) the

Plaintiffs' Cross-Motion for Summary Judgment ("Pls.' Mot." or the "plaintiffs' motion"), ECF

No. 41.  Upon careful consideration of the parties' submissions,[1] the Court concludes for the

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."), ECF No. 38-2; (2) the Defendant's Statement of Material Facts Not in Dispute ("Def.'s Facts"), ECF No. 38-3; (3) the Memorandum of Points and Authorities in Support of Plaintiffs' Cross-Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment ("Pls.' Mem."), ECF No. 41-1; (4) the Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Pls.' Facts"), ECF No. 41-9; (5) the Plaintiffs' Response to Defendant's Statement of Material Facts Not in Dispute in Support of Defendant's Motion for Summary Judgment ("Pls.' Resp. to Def.'s Facts"), ECF No. 41-10; (6) the Reply Memorandum in Further Support of Defendant's Motion for Summary Judgment and Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Opp'n"), ECF No. 49; (7) the Defendant's Response to Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Cross Motion for Summary Judgment ("Def.'s Resp. to Pls.' Facts"), ECF No. 49-4; (8) the Defendant's Response to Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Cross Motion for Summary Judgment ("Def.'s Reply"), ECF No. 50; (9) the Plaintiffs' Reply in Support

(continued . . .)

following reasons that it must grant in part and deny in part both the defendant's motion for summary judgment and the plaintiffs' cross-motion for summary judgment.

## I.     BACKGROUND

### A.     Factual Background

On August 6, 2020, the plaintiffs submitted a FOIA request to the Bureau, "seeking information related to COVID-19 and the costs of carrying out federal executions."  See Pls.' Facts ¶ 1; see Def.'s Resp. to Pls.' Facts ¶ 1.  Specifically, the plaintiffs sought "information for ten subcategories related to the federal executions, including information about COVID-19 testing at [Federal Correctional Complex (']FCC['])] Terre Haute, Indiana, contact tracing, and cost and staff data for the federal executions."  Pls.' Facts ¶ 2; see Def.'s Resp. to Pls.' Facts ¶ 2; see also Declaration of Cassandra Stubbs, Attorney at Law ("Stubbs Decl."), Exhibit ("Ex.") 1 (Request Under Freedom of Information Act ("FOIA Request")) at 4–6, ECF No. 41-3.  The plaintiffs requested this information "in order to inform the public about matters of significant public interest related to how the federal government was carrying out the federal executions[,]" Pls.' Facts ¶ 5; see Def.'s Resp. to Pls.' Facts ¶ 5, "sought expedited processing[,]" Pls.' Facts ¶ 6; see Def.'s Resp. to Pls.' Facts ¶ 6, and "requested that [the Bureau] produce the records in advance of the next scheduled execution" following the filing of the initial Complaint, which was scheduled for August 26, 2020,  Pls.' Facts ¶ 9; see Def.'s Resp. to Pls.' Facts ¶ 9 (disputing the plaintiffs' representation of an alleged August 24, 2020 execution date and stating that the execution date was actually August 26, 2020); Stubbs Decl., Ex. 1 (FOIA Request) at 8 ("The

(. . . continued)
of Cross-Motion for Summary Judgment ("Pls.' Reply"), ECF No. 52; (10) the Defendant's Supplemental Memorandum of Law ("Def.'s Supp. Mem."), ECF No. 55; (11) the Plaintiffs' Response to Defendant's Supplemental Memorandum of Law ("Pls.' Resp. to Def.'s Supp. Mem."), ECF No. 56; and (12) the defendant's Notice of Supplemental Authority ("Def.'s Notice"), ECF No. 57.

[plaintiffs] therefore ask[] that the requested information be disclosed within ten days, in advance of the next federal executions, the first of which is scheduled for August 26, 2020.").

On August 7, 2020, the Bureau "acknowledged the request . . . and indicated that the request would be expedited to the best of [the Bureau's] ability." Def.'s Facts ¶ 3; see Pls.' Resp. to Def.'s Facts ¶ 3. According to the Bureau, "[o]verall, [it] conducted searches that were reasonably calculated to locate all records responsive to [the p]laintiffs' requests." Def.'s Facts ¶ 9; see Pls.' Resp. to Def.'s Facts ¶ 9; see also Def.'s Facts ¶¶ 4–8 (detailing search procedures conducted for specific requests); Pls.' Resp. to Def.'s Facts ¶¶ 4–8. However, "[b]y August 21, 2020, [the d]efendant had not produced any records[.]" Pls.' Facts ¶ 10; see Def.'s Resp. to Pls.' Facts ¶ 10. The plaintiffs filed their initial Complaint in this case on August 21, 2020, see Pls.' Facts ¶ 11; Def.'s Resp. to Pls.' Facts ¶ 11; Compl. at 1, and the Bureau "processed all of the potentially responsive records that they located[,] and produced . . . material to [the p]laintiffs on a rolling basis between September 18, 2020[,] and January 7, 2021[,]" Def.'s Facts ¶ 10; see Pls.' Resp. to Def.'s Facts ¶ 10.

However, the defendant withheld some information, claiming exemptions pursuant to 5 U.S.C. § 552(b)(4) ("Exemption 4"); 5 U.S.C. § 552(b)(6) ("Exemption 6"); 5 U.S.C. § 552(b)(7)(C) ("Exemption 7(C)"); 5 U.S.C. § 552(b)(7)(E) ("Exemption 7(E)"); and 5 U.S.C. § 552(b)(7)(F) ("Exemption 7(F)").[2] See Def.'s Facts ¶¶ 11–12, 14–16; Pls.' Resp. to Def.'s Facts ¶¶ 11–12, 14–16.

---

[2] The defendant also withheld information pursuant to exemption pursuant to 5 U.S.C. § 552(b)(7)(A) ("Exemption 7(A)"). See Def.'s Facts ¶ 13; Pls.' Resp. to Def.'s Facts ¶ 13. However, in its Supplemental Memorandum of Law, filed on July 23, 2021, the defendant indicated that "[o]n July 1, 2021, the Attorney General directed a review of the Department of Justice's policies and procedures regarding the administration of existing federal laws governing capital sentences, and imposed a moratorium on federal executions during the pendency of that review." Def.'s Suppl. Mem. at 1. The defendant further stated that "[a]fter considering how these developments affect the issues in this case, [the Bureau] has determined that it will no longer rely on Exemption 7(A) to withhold records or portions of records in this case[,]" id., but that "[t]he majority of the records and portions of records that [the Bureau]

(continued . . .)

As set out in the <u>Vaughn</u> Index, ECF 38-8, the information withheld in part or in full includes:

- Job titles and job posts redacted from COVID-19 contact tracing and spreadsheets (Categories 4–7 of the <u>Vaughn</u> Index);

- Redactions of the names of vendors, contractors, and related cost information on a Tracking Report (Category 8 of the <u>Vaugh[n]</u> Index);

- Redactions or whole withholdings of the identities of companies who procured [p]entobarbital, descriptions of the substance, quantity and concentration of the pentobarbital; information about production timelines; purchase dates and deliveries in vouchers, contracts, invoices, emails, obligations, payment reports, and vendor payment forms (Categories 9, 10, 13, and 15 of the <u>Vaughn</u> Index); [and]

- Redactions that might reveal the numbers of individuals who participated in staffing of the execution (Categories 16 and 19 of the <u>Vaughn</u> Index).

Pls.' Facts ¶ 21 (underlines added); <u>see</u> Def.'s Resp. to Pls.' Facts ¶ 21; <u>see also</u> Declaration of Kara Christenson ("Christenson Decl." or the "Christenson Declaration"), Ex. D (<u>Vaughn</u> Index), ECF No. 38-8.

## B.   **Procedural Background**

On August 21, 2020, the plaintiffs filed their initial Complaint in this case, <u>see</u> Compl. at 1, and on September 4, 2020, the plaintiffs filed their Amended Complaint, <u>see</u> Amended Complaint for Injunctive and Declaratory Relief ("Am. Compl."), ECF No. 17-1.  On March 5, 2021, the defendant filed its motion for summary judgment, <u>see</u> Def.'s Mot, and on April 23, 2021, the plaintiffs filed their cross-motion for summary judgment and opposition to the defendant's motion, <u>see</u> Pls.' Mot.  The defendant filed its opposition to the plaintiffs' cross-

---

(. . . continued)

previously withheld pursuant to Exemption 7(A) remain properly withheld under other FOIA exemptions[,]" <u>id.</u> Furthermore, the defendant represented that "[t]he few pieces of information that were withheld <u>solely</u> pursuant to Exemption 7(A), including information in Records 8 and 10 relating only to the identity of specialty medical suppliers and their equipment, w[ould] be released in a supplemental production on or before August 6, 2021."  <u>Id.</u> at 2 (emphasis in original).  Thus, the defendant no longer claims exemption of any records pursuant to Exemption 7(A).

motion and its reply in support of its motion on June 4, 2021, <u>see</u> Def.'s Opp'n; Def.'s Reply,

and the plaintiffs filed a reply in support of their cross-motion on July 2, 2021, <u>see</u> Pls.' Reply.

On July 8, 2021, the defendant "request[ed] leave of the Court to file a supplemental

memorandum of law" regarding the effect of "the Attorney General direct[ing] a review of the

Department of Justice's policies and procedures regarding the administration of existing federal

laws governing capital sentences" on "[the Bureau]'s legal arguments or the application of any

FOIA exemptions in this matter."  Unopposed Motion for Leave to File a Supplemental

Memorandum of Law at 1, ECF No. 53.  The Court granted this request, <u>see</u> Order at 1 (July 15,

2021), ECF No. 54, and the defendant filed its supplemental memorandum of law on July 23,

2021, <u>see</u> Def.'s Suppl. Mem. at 1.  The plaintiffs filed a response to the defendant's

supplemental memorandum of law on August 3, 2021.  <u>See</u> Pls.' Resp. to Def.'s Suppl. Mem.

Finally, on October 7, 2021, the defendant filed a notice of supplemental authority, namely, an

opinion issued in <u>Citizens for Resp. and Ethics in Wash. v. U.S. Dep't of Just.</u>, 567 F. Supp. 3d

204 (D.D.C. 2021), "one of two other pending cases in this district involving FOIA requests for

records regarding the Bureau['s] [ ] acquisition of pentobarbital and involving some of the same

and substantially similar records as the records at issue in this case."  <u>See</u> Def.'s Notice at 1.  The

plaintiffs did not file a response to the defendant's notice.

## II.    STANDARD OF REVIEW

The Court must grant a motion for summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the Court must

view the evidence in the light most favorable to the non-moving party.  <u>See</u> <u>Holcomb v. Powell</u>,

433 F.3d 889, 895 (D.C. Cir. 2006) (citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133,

150 (2000)).  The Court must therefore draw "all justifiable inferences" in the non-moving

party's favor and accept the non-moving party's evidence as true.  Anderson v. Liberty Lobby,

477 U.S. 242, 255 (1986).  The non-moving party, however, cannot rely on "mere allegations or

denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at

248), but must instead present specific facts "such that a reasonable [factfinder] could return a

verdict for the non[-]moving party," Grosdidier v. Broad. Bd. of Governors, Chairman, 709 F.3d

19, 23 (D.C. Cir. 2013) (quoting Anderson, 477 U.S. at 248).  Thus, "[c]onclusory allegations

unsupported by factual data will not create a triable issue of fact."  Pub. Citizen Health Rsch.

Grp. v. Food & Drug Admin., 185 F.3d 898, 908 (D.C. Cir. 1999) (Garland, J., concurring)

(alteration in original) (quoting Exxon Corp. v. Fed. Trade Comm'n, 663 F.2d 120, 127 (D.C.

Cir. 1980)).  If the Court concludes that "the non[-]moving party has failed to make a sufficient

showing on an essential element of [its] case with respect to which [it] has the burden of proof,"

then the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986).  Thus, when "ruling on cross-motions for summary judgment, the [C]ourt shall grant

summary judgment only if one of the moving parties is entitled to judgment as a matter of law

upon material facts that are not genuinely disputed."  Shays v. Fed. Electoral Comm'n, 424 F.

Supp. 2d 100, 109 (D.D.C. 2006).

        "FOIA cases typically are resolved on motions for summary judgment."  Ortiz v. U.S.

Dep't of Just., 67 F. Supp. 3d 109, 116 (D.D.C. 2014); see also Defs. of Wildlife v. U.S. Border

Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  The "FOIA requires federal agencies to disclose,

upon request, broad classes of agency records unless the records are covered by the statute's

exemptions."  Students Against Genocide v. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001);

see also Wash. Post Co. v. U.S. Dep't of Just., 863 F.2d 96, 101 (D.C. Cir. 1988) ("[The] FOIA

is to be interpreted with a presumption favoring disclosure and exemptions are to be construed narrowly."). In a FOIA action, the agency has "th[e] burden of demonstrating that the withheld documents are exempt from disclosure[,]" Boyd v. U.S. Dep't of Just., 475 F.3d 381, 385 (D.C. Cir. 2007), and this burden "cannot be met by mere conclusory statements," Wash. Post Co., 863 F.2d at 101. "The agency may meet this burden by filing affidavits describing the material withheld and the manner in which it falls within the exemption claimed[,]" King v. U.S. Dep't of Just., 830 F.2d 210, 217 (D.C. Cir. 1987), and by "show[ing] how release of the particular material would have the adverse consequence that the [FOIA] seeks to guard against," Wash. Post Co., 863 F.2d at 101.

Courts will grant summary judgment to the agency in a FOIA case only if the agency can prove "that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Friends of Blackwater v. U.S. Dep't of Interior, 391 F. Supp. 2d 115, 119 (D.D.C. 2005) (quoting Greenberg v. U.S. Dep't of Treasury, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)). Thus, in a lawsuit brought to compel the production of documents under the FOIA, "an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly[, or partially,] exempt from [disclosure].'" Students Against Genocide, 257 F.3d at 833 (first alteration in original) (quoting Goland v. Cent. Intel. Agency, 607 F.2d 339, 352 (D.C. Cir. 1978)). Even when the requester files a motion for summary judgment, the government "ultimately [has] the onus of proving that the [documents] are exempt from disclosure." Pub. Citizen Health Rsch. Grp., 185 F.3d at 904 (alterations in original) (quoting Nat'l Ass'n of Gov't Emps. v. Campbell, 593 F.2d 1023, 1027 (D.C. Cir. 1978)). However, "[t]he burden upon the

requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" Id. at 904–05.

   In 2016, Congress amended the FOIA to add a "foreseeable harm" requirement, which allows withholding of information "only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption" or the "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). "Stated differently, pursuant to the FOIA Improvement Act, an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest" and if the law does not prohibit the disclosure. Jud. Watch, Inc. v. U.S. Dep't of Com., 375 F. Supp. 3d 93, 98 (D.D.C. 2019) (quoting Rosenberg v. U.S. Dep't of Def., 342 F. Supp. 3d 62, 73 (D.D.C. 2018)).

## III.   ANALYSIS

   The defendant argues that it is entitled to summary judgment because it "conducted a reasonable search, and each of [its] withholdings is justified under the appropriate FOIA exemption[.]" Def.'s Mem. at 2. However, the plaintiffs in their cross-motion for summary judgment contest the defendant's withholdings based on all claimed exemptions, see Pls.' Mem. at 1–2, and argue that "even if some information has been properly withheld under those exemptions, [the Bureau] has failed to adequately segregate and produce the non-exempt material[,]" id. at 2.[3] The Court will therefore address the parties' arguments regarding each of the defendant's claimed FOIA exemptions in turn, followed by an analysis of segregability.[4]

_____

[3] The plaintiffs also argue that "[the Bureau's] motion is defective on its face, because its factual support for the invocation of exemptions is inadequate and rests on a declaration that fails to satisfy" requirements of affidavits or declarations submitted in support of a motion for summary judgment. Pls.' Mem. at 16. The plaintiffs refer specifically to the declaration of Kara Christenson, see Declaration of Kara Christenson ("Christenson Decl."), ECF No. 38-4, stating that "Ms. Christenson's declaration is too thin a reed to support the sweeping asserted facts she asks this Court to accept[,]" Pls.' Mem. at 16, and that "[a] motion to strike Ms. Christenson's declaration on account of these defects w[ould] be filed shortly[,]" id. at 16 n.6. The Court thereafter considered the plaintiffs' motion to strike, see Plaintiffs' Motion to Strike Declaration of Kara Christenson (ECF No. 38-4) ("Pls.' Mot. to

(continued . . .)

A.      **Exemption 4**

Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential[.]"  5 U.S.C. § 552(b)(4).  "Where withheld records do not contain trade secrets, an agency must establish that the records are '(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential' to sustain the burden of showing that Exemption 4 was properly applied."  Ctr. for Investigative Reporting v. U.S. Customs and Border Prot., 436 F. Supp. 3d 90, 108 (D.D.C. 2019) (quoting Pub. Citizen Rsch. Grp. v. Food and Drug Admin., 704 F.2d 1280, 1290 (D.C. Cir. 1983)).

Here, the defendant has withheld two types of information pursuant to Exemption 4: (1) "information provided to [the Bureau] by individuals or companies who performed critical services relating to the federal execution process, such as third-party contractors," Def.'s Opp'n at 6 (citing Christenson Decl. ¶¶ 28–29), and (2) "information provided to [the Bureau] by individuals or companies who provided pentobarbital or performed pentobarbital-related critical services," id. (citing Christenson Decl. ¶¶ 28, 30).  In effect, the defendant has withheld both the "identities of the pentobarbital suppliers[,]" id. at 7, and "[i]nformation [a]bout [c]ontract [t]erms, [p]ricing, and [s]imilar [i]nformation [r]egarding [the Bureau's] [s]upply of [l]ethal

---

(. . . continued)

Strike"), ECF No. 44, and in denying the motion, concluded that "the Christenson [D]eclaration is supported by the personal knowledge, competency, and admissibility required by [Federal] Rule [of Civil Procedure] 56(c)(4)[,]" Am. C.L. Union v. Fed. Bureau of Prisons, No. 20-cv-2320 (RBW), 2022 WL 1262112, at *6 (D.D.C. Apr. 28, 2022) (Walton, J.).  Therefore, based upon the reasoning in the Court's opinion denying the plaintiffs' motion to strike, the Court also concludes that the Christenson Declaration is admissible in considering the defendant's summary judgment arguments.  See id. at *2–5 (applying legal standards regarding a motion to strike that are specific to the summary judgment context).

[4] The plaintiffs did not respond to the defendant's argument that it "[c]onducted an [a]dequate [s]earch[,]" Def.'s Mem. at 7; see generally Pls.' Mot., and does not dispute the defendant's contention that "[o]verall, [the Bureau] conducted searches that were reasonably calculated to locate all records responsive to [the p]laintiffs' requests[,]" Def.'s Facts ¶ 9; see Pls.' Resp. to Def.'s Facts ¶ 9.  Therefore, the Court treats this point as conceded.  See Rosenblatt v. Fenty, 734 F. Supp. 2d 21, 22 (D.D.C. 2010) ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded.").

[i]njection [s]ubstances[,]" id. at 11.  The parties agree that this information was "obtained from a person[,]" 5 U.S.C. § 552(b)(4), within the meaning of Exemption 4, see Def.'s Mem. at 14; Pls.' Reply at 6, but the plaintiffs "dispute whether the information is commercial and whether it is confidential[,]" id.  Accordingly, the Court will first analyze whether the withheld information is commercial, and second, analyze whether it is confidential.

### 1.  Whether the Withheld Information is Commercial

The defendant argues that "disclosure of [the identities of] the individuals and companies who do business with [the Bureau] in connection with [the Bureau's] federal execution responsibilities would subject them to controversy and injure their commercial interests[,]" Def.'s Mem. at 13, and that, "[u]nder these circumstances, the identity of an entity in a commercial relationship with an agency can be withheld under Exemption 4[,]" id.  Moreover, the defendant states that "beyond their identities, the suppliers and contractors have a commercial interest in the prices that they set, in product descriptions, and other withheld information."[5]  Id. at 13–14.  In response, the plaintiffs argue that "the identity of the entities that provided critical services related to the execution[s] and pentobarbital do not qualify as commercial or financial information and therefore do not fall under Exemption 4."[6]  Pls.' Mem. at 20.

---

[5] The defendant does not argue that the information it has withheld constitutes financial information, but rather rests its argument on the position that the information constitutes commercial information.  See generally Def.'s Mem. at 12–14; Def.'s Opp'n at 7–11.

[6] The plaintiffs do not contest the defendant's contention that "the suppliers and contractors have a commercial interest in the prices that they set, in product descriptions, and other withheld information[,]" Def.'s Mem. at 13–14. See generally Pls.' Mem. at 20–22; Pls.' Reply at 6–7.  Therefore, the Court will treat this point as conceded.  See Rosenblatt, 734 F. Supp. 2d at 22 ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded.").

"Exemption 4 is not confined only to records that 'reveal basic commercial operations . . . or relate to the income-producing aspects of a business.'" Baker & Hostetler LLP v. U.S. Dep't of Com., 473 F.3d 312, 319 (D.C. Cir. 2006) (quoting Pub. Citizen Health Rsch. Grp., 704 F.2d at 1290) (emphasis omitted) (alteration in original)).  Rather, "[t]he exemption reaches more broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency."  Id.  Moreover, "while a company may not always have a commercial interest in its name and identity, the Court may [ ] consider the context in which the issue arises."  Elec. Priv. Info. Ctr. ("EPIC") v. U.S. Dep't of Homeland Sec., 117 F. Supp. 3d 46, 62–63 (D.D.C. 2015).  For example, where "[t]he companies are commercial enterprises doing business with the [g]overnment and the reason they seek protection from having their participation disclosed is because of the potential effect that disclosure would have on their businesses[,]" id. at 63, the Court may conclude that their identities "are correctly considered commercial information in th[at] particular context[,]" id.[7] This is especially true where companies have "taken affirmative steps to protect their identities by using confidentiality agreements."  Id. at 62.  Another member of this Court has specifically concluded that, because pentobarbital is supplied for executions, "pentobarbital suppliers face a serious risk to their commercial fortunes should the public become aware that they supply the

---

[7] The plaintiffs rely heavily on Public Citizen v. U.S. Dep't of Health and Human Servs., 975 F. Supp. 2d 81 (D.D.C. 2013), and Hodes v. U.S. Dep't of Housing and Urban Dev., 532 F. Supp. 2d 108 (D.D.C. 2008), to support their position that "[c]ourts have repeatedly ruled that identities are not commercial or financial information for purposes of Exemption 4[,]" Pls.' Mem. at 20.  However, both of these cases either discuss, or rely on cases that discuss, this issue in the context of a "substantial competitive harm" analysis, see Pub. Citizen, 975 F. Supp. 2d at 106–07 (citing United Techs. Corp. v. U.S. Dep't of Def., 601 F.3d 557 (D.C. Cir. 2010)); Hodes, 532 F. Supp. 2d at 117–19—a former requirement as part of the Exemption 4 "commercial information" analysis, which the Supreme Court has rejected, see Food Mktg. Inst. v. Argus Leader Media, 139 S. Ct. 2356, 2359 (2019) ("Argus Leader urges the Court to adopt a 'substantial competitive harm' requirement as a matter of policy because it believes FOIA exemptions should be narrowly construed.  But the Court cannot arbitrarily constrict Exemption 4 by adding limitations found nowhere in its terms."); id. at 2361 ("Finding at least this 'competitive harm' requirement inconsistent with the terms of the statute, we reverse.").  And, therefore, these arguments advanced by the plaintiffs are not persuasive in light of the Supreme Court's holding.

drug to the government[,]" Citizens for Resp. and Ethics in Wash. ("CREW") v. U.S. Dep't of Just., 567 F. Supp. 3d 204, 212 (D.D.C. 2021); see generally Def.'s Notice.  See CREW, 567 F. Supp. 3d at 212 ("The competitive harm here is quite clear—revelation of the companies' identity could lead to harassment, cost them business, or force them to exit the pentobarbital market entirely.  This is a 'competitive disadvantage to the submitting entity' that 'could result' from 'disclosure.'" (quoting Jud. Watch, Inc., Food & Drug Admin., 449 F.3d 141, 148 (D.C. Cir. 2006)).

As in CREW, the defendant here supports its position—that disclosure of the pentobarbital suppliers' and critical service providers' identities would create competitive consequences—with examples of companies who have experienced harassment and competitive disadvantage in the past "as a result of negative publicity surrounding [their] government contract[s] to provide lethal injection drugs."  Id.; see Def.'s Mem. at 13; Christenson Decl. ¶¶ 33–35.  Moreover, the defendant's declarant has attested that, as to the information withheld under Exemption 4, including the pentobarbital suppliers' identities, "the individuals/companies providing the information have typically kept it private . . . and have expressly required or requested that the [g]overnment maintain the information as confidential to the greatest extent possible under the law," Christenson Decl. ¶ 31, "because those individuals and companies involved in [the Bureau's] procurement of [p]entobarbital and third-party contractors who provide critical execution-related services, are well aware that those involved in the execution process . . . are commonly subject to harassment, threats, and negative publicity leading to commercial decline[,]" id. ¶ 32.  Thus, the defendant has stated a "potential effect that disclosure would have on [the suppliers' and service providers'] businesses[,]" EPIC, 117 F. Supp. 3d at 63, which is beyond "mere conjecture[,]" CREW, 567 F. Supp. 3d at 212.  Moreover, the suppliers

and service providers have also "taken affirmative steps to protect their identities[,]" EPIC, 117

F. Supp. 3d at 62, in this case.  Accordingly, the Court concludes that the identities of the

individuals or companies who performed critical services relating to the federal execution

process, such as third-party contractors, as well as the identities of the pentobarbital suppliers,

constitute commercial information pursuant to Exemption 4.

## 2.  Whether the Withheld Information is Confidential

The defendant next argues that "both categories of information [withheld] are

confidential because the third-party contractors . . . have typically kept the withheld information

private, [ ] have specifically designated it as proprietary or confidential, and have sought and

received [the Bureau's] agreement to keep the information confidential to the greatest extent

possible."  Def.'s Mem. at 15 (citing Christenson Decl. ¶¶ 31–32, 38).  In response, the plaintiffs

argue that the Bureau has "failed to show that the information is customarily treated as

private[,]" Pls.' Mem. at 23, and instead, argues that the information should be considered

confidential because of its "association with controversial executions[,]" id., even though

"'Exemption 4 does not guard against mere embarrassment in the marketplace or reputational

injury[,]'" id. (quoting United Techs. Corp., 601 F.3d at 564).[8]

The Supreme Court has articulated "two conditions that might be required for

information communicated to another to be considered confidential[,]" Food Mktg. Inst. v. Argus

Leader Media, 139 S. Ct. 2356, 2363 (2019), within the meaning of Exemption 4: (1) that the

information is "customarily kept private, or at least closely held, by the person imparting it[,]" id.

---

[8] The plaintiffs also argue that the defendant has failed to show that the withheld information was treated as private "because it relies only on the declaration of Ms. Christenson, who lacks any personal knowledge of agreements made about the designation or treatment of this information."  Pls.' Mem. at 22.  However, the Court has already addressed this argument in its earlier Memorandum Opinion denying the plaintiffs' motion to strike the Christenson Declaration, and concluded that "the Christenson [D]eclaration is supported by the personal knowledge, competency, and admissibility required by [Federal] Rule [of Civil Procedure] 56(c)(4)[,]" Am. C.L. Union, 2022 WL 1262112, at *6.  See supra note 3.

(stating that to be "customarily kept private[,]" the information must be "known only to a limited few[,]" "not publicly disseminated[,]" or "intended to be held in confidence or kept secret"); and (2) that "the party receiving [the information] provides some assurance that it will remain secret[,]" id.  Although "[t]he [Supreme] Court did not make a holding as to whether both conditions need be met[,]" CREW, 567 F. Supp. 3d at 213 (citing Food Mktg. Inst., 139 S. Ct. at 2363), both conditions are satisfied in this case.

First, commercial information is considered confidential within the meaning of Exemption 4 if it is "of a kind that would customarily not be released to the public by the person from whom it was obtained." Critical Mass Energy Project v. Nuclear Regul. Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992).  In determining whether particular information is customarily kept private, "the [C]ourt will consider how the particular party customarily treats the information, not how the industry as a whole treats the information." Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 244 F.3d 144, 148 (D.C. Cir. 2001) (citing Critical Mass, 975 F.2d at 872, 878–80) (emphasis added).  Furthermore, "[t]o establish submitter custom for purposes of Exemption 4, 'it is sufficient for an agency to proceed solely on its sworn affidavits[,]'" Ctr. for Investigative Reporting, 436 F. Supp. 3d at 110 (quoting Jud. Watch, Inc. v. U.S. Dep't of Com., 337 F. Supp. 2d 146, 171 (D.D.C. 2004)), so long as the affidavits are "made on personal knowledge[,]" Animal Legal Def. Fund, Inc. v. Dep't of Air Force, 44 F. Supp. 2d 295, 303 (D.D.C. 1999).  Here, the defendant represents through its declarant that

> [t]he commercial information described in both categories [ ], obtained from a person and submitted to the government, is confidential because the individuals/companies providing the information have typically kept it private, have specifically designated the information as proprietary and/or confidential, and have expressly required or requested that the [g]overnment maintain the information as confidential to the greatest extent possible under the law, a condition to which the [g]overnment has agreed to abide during in-person meetings and/or telephone conference calls.

. . .

> This information is kept private because those individuals and companies
> involved in [the Bureau's] procurement of [p]entobarbital and third-party
> contractors who provide critical execution-related services, are well aware that
> those involved in the execution process (at the state or federal level) are
> commonly subject to harassment, threats, and negative publicity leading to
> commercial decline.

Christenson Decl. ¶¶ 31–32.  Having already concluded that the Christenson Declaration is

"supported by [ ] personal knowledge," Am. C.L. Union v. Fed. Bureau of Prisons, No. 20-cv-

2320 (RBW), 2022 WL 1262112, at *6 (D.D.C. Apr. 28, 2022), the Court further concludes that

the defendant, through this declaration, has established that the information withheld was

customarily kept confidential, see Ctr. for Investigative Reporting, 436 F. Supp. 3d at 111

(stating that, among other ways, an agency declarant may establish personal knowledge of a

submitter's custom "by indicating that the agency reached an 'understanding' with the submitters

'that the information w[ould] be held in confidence by the [United States] and not publicly

divulged'" (quoting Jud. Watch, Inc., 337 F. Supp. 3d at 171) (first alteration in original)).

Second, commercial information is considered confidential if "the party receiving [the

information] provides some assurance that it will remain secret."  Food Mktg. Inst., 139 S. Ct. at

2363.  Here, the Christenson Declaration clearly establishes that the Bureau made such

assurances.  Specifically, as just noted, Christenson states that "the individuals/companies

providing the information . . . have expressly required or requested that the [g]overnment

maintain the information as confidential to the greatest extent possible under the law, a condition

to which the [g]overnment has agreed to abide during in-person meetings and/or telephone

conference calls."  Christenson Decl. ¶ 31.  Thus, the representations regarding an "express[]

require[ment] or request[,]" id., by the suppliers and providers, and the statement that "the

[g]overnment has agreed to abide[,]" id., by this "condition[,]" id., show that the defendant has "provide[d] some assurance that [the information] will remain secret[,]" Food Mktg. Inst., 139 S. Ct. at 2363.  Compare Christenson Decl. ¶ 31, with CREW, 567 F. Supp. 3d at 213 (finding identical commercial information confidential where "'the [g]overnment ha[d] agreed to abide' by the companies' request 'that the [g]overnment maintain the information as confidential to the greatest extent possible under law'") (internal citation omitted).  Accordingly, the Court concludes that the withheld information constitutes confidential commercial information within the meaning of Exemption 4 and that, therefore, the defendant has properly withheld this information pursuant to Exemption 4.

**B.      Exemption 6**

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 6 is designed "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information" maintained in government records, U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 599 (1982), regardless of "the label [on] the file," id. at 601.  "The Court's first task in assessing whether non-disclosure is warranted [pursuant to Exemption 6] is to determine whether the responsive records are personal, medical or similar files."  Houser v. U.S. Dep't of Health & Hum. Servs., 486 F. Supp. 3d 104, 115 (D.D.C. 2020) (Walton, J.) (citing Multi Ag. Media LLC v. Dep't of Agric., 515 F.3d 1224, 1228 (D.C. Cir. 2008)); see Gov't Accountability Project v. U.S. Dep't of State, 699 F. Supp. 2d 97, 105–06 (D.D.C. 2010) ("The term[] 'similar files' is construed broadly and 'is intended to cover detailed [g]overnment records on an individual which can be identified as applying to that individual.'" (quoting Wash. Post Co., 456 U.S. at 602)).  "The information in

the file 'need not be intimate' for the file to satisfy the standard, and the threshold for

determining whether information applies to a particular individual is minimal."  Milton v. U.S.

Dep't of Just., 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting N.Y. Times Co. v. Nat'l

Aeronautics & Space Admin., 920 F.2d 1002, 1006 (D.C. Cir. 1990)).  Once that threshold

requirement is met, the Court must determine whether disclosure of the information "would

constitute a clearly unwarranted invasion of personal privacy."  Multi Ag. Media LLC, 515 F.3d

at 1228 (quoting 5 U.S.C. § 552(b)(6)).  "This second inquiry requires [the Court] to balance the

privacy interest that would be compromised by disclosure against any public interest in the

requested information."  Id.

Here, the defendant has withheld various records pursuant to Exemption 6, see

Christenson Decl., Ex. D (Vaughn Index) at 1–10 (reflecting withholding based upon Exemption

6 for records 1–10, 12–13, and 15–19), which it applied in order to withhold

> names, register numbers, initials, signatures, addresses, email addresses,
> telephone numbers, job titles, department titles, law enforcement credential
> numbers, and bank account information that could be used to identify [Bureau]
> staff, outside law enforcement officers involved in the execution protocol,
> third-party contractors, third-party individuals who participated in the federal
> government's procurement of pentobarbital or provided critical
> pentobarbital-related services, and other third-party individuals including inmates.

Def.'s Mem. at 18 (citing Christenson Decl. ¶¶ 42, 44, 72).[9]  The defendant advances two

primary arguments in support of its Exemption 6 withholdings: (1) that, "[f]or the COVID-

related records, . . . revealing the identities of the specific individuals referenced would

necessarily reveal their sensitive health information[,]" thus implicating privacy concerns, id. at

19 (citing Christenson Decl. ¶ 44); see Christenson Decl., Ex. D (Vaughn Index) at 1–3

[9] The defendant withheld these same records pursuant to Exemption 7(C).  See Def.'s Mem. at 18.  Although the
defendant addresses its application of Exemptions 6 and 7(C) concurrently, see generally id. at 18–20, the Court will
address the application of Exemption 7(C) separately, see infra Section III.C.2.

(reflecting COVID-related records requests for records 1–7); and (2) that, "[d]ue to the controversial nature of the federal execution process, the [Bureau] employees and third-party individuals whose identifying information was withheld have substantial privacy interests in avoiding disclosure of their participation in the execution process[,]" Def.'s Mem. at 19–20.  In response, the plaintiffs argue that Exemption 6 is "meant to protect only records that would identify and threaten specific individuals[,]" and the Bureau has thus impermissibly "claimed [a] privacy . . . exemption[] for a wide swath of information, much of which has little or nothing to do with personal information on individuals, and which could not plausibly be used to identify any individuals."  Pls.' Mem. at 37.  Furthermore, the plaintiffs argue that "[t]he public has an obvious interest in how [the Bureau] spends taxpayer money and performs its duties[,] . . . particularly [ ] in the context of the government's killing of its own citizens during a global pandemic."  Id. at 38.

### 1.   Whether the Withheld Files Constitute Personal, Medical, or Similar Files

First, as a threshold matter, the Court concludes that all records withheld pursuant to Exemption 6—except for record 16—constitute "personal, medical or similar files[,]" Houser, 486 F. Supp. 3d at 115, within the meaning of Exemption 6.  As reflected in the Vaughn Index, records 1–7 all contain information related to "COVID-19 testing[,]" see Christenson Decl., Ex. D (Vaughn Index) at 1–3 (records 1–3, 5, and 7), or COVID-19 "[c]ontact [t]racing[,]" see id., Ex. D (Vaughn Index) at 1–3 (records 4 and 6), which clearly qualify as medical files of either staff or inmates.

Records 8 and 10 are expenses and payment reports, which were redacted pursuant to Exemption 6 because they included "[i]dentit[ies] of [Bureau] staff, witnesses, and confidential, third party contractors involved in federal executions[,]" see id., Ex. D (Vaughn Index) at 3–4.

Although the files themselves are not personnel or medical files <u>per se</u>, they do constitute

"similar files[,]" 5 U.S.C. § 552(b)(6), to the extent that they reference various individuals'

identities and therefore contain "bits of personal information, such as names . . . , the release of

which would 'create[] a palpable threat to privacy[,]'" <u>Jud. Watch, Inc.</u>, 449 F.3d at 152–53

(quoting <u>Carter v. U.S. Dep't of Com.</u>, 830 F.2d 388, 391 (D.C. Cir. 1987)) (second alteration in

original).  <u>See</u> <u>Skybridge Spectrum Found. v. Fed. Commc'ns Comm'n</u>, 842 F. Supp. 2d 65, 83

(D.D.C. 2012) ("[C]ourts look 'not to the nature of the files,' but rather to 'the nature of the

information' at issue.'" (quoting <u>N.Y. Times Co.</u>, 920 F.2d at 1006)).

　　　　Records 12 and 17–19 are "[q]uarterly [p]reventative [m]aintenance logs[,]" Christenson

Decl., Ex. D (<u>Vaughn</u> Index) at 6 (record 12), "[i]ncident [c]ommand [s]ystem . . . forms[,]" <u>id.</u>,

Ex. D (<u>Vaughn</u> Index) at 9 (record 17), "[o]utside law enforcement meeting sign[-]in sheets[,]"

<u>id.</u>, Ex. D (<u>Vaughn</u> Index) at 9 (record 18), and "[d]eployment [r]osters[,]" <u>id.</u>, Ex. D (<u>Vaughn</u>

Index) at 10 (record 19), which were withheld because they contain "[i]dentifying information of

[Bureau] staff [and/or] outside law enforcement officers (names, titles, signatures, and phone

numbers) who were involved in federal executions[,]" <u>id.</u>, Ex. D (<u>Vaughn</u> Index) at 9; <u>see also</u>

<u>id.</u>, Ex. D (<u>Vaughn</u> Index) at 6 (describing the exempt material in record 12 as "[i]dentifying and

contact information, including names, job titles, employee ID numbers, and/or signatures of

[Bureau] staff [and] [i]dentifying information, including names and/or Federal Register Numbers

of [Bureau] <u>inmates</u>" (emphasis added)).  Again, while these documents are not medical or

personnel files, the redacted portions contain "bits of personal information, such as names and

addresses," <u>Jud. Watch, Inc.</u>, 449 F.3d at 152, and therefore qualify as "similar files[,]" 5 U.S.C.

§ 552(b)(6); <u>see</u> <u>Houser</u>, 486 F. Supp. 3d at 115, within the meaning of Exemption 6.

Finally, records 9, 13, and 15–16 consist of "[v]oucher [v]alidation [r]eports[,] [c]ontracts[,] . . . emails[,]" Christenson Decl., Ex. D (Vaughn Index) at 4 (record 9), "[v]endor payment forms[,]" id., Ex. D (Vaughn Index) at 6 (record 13), "[i]nvoices[,]" id., Ex. D (Vaughn Index) at 7–8 (record 15), and "[an] [e]xpense report[,]" id., Ex. D (Vaughn Index) at 9 (record 16), which were withheld because they contain "[i]dentifying information . . . that could lead to the identit[ies]" of Bureau Staff and/or third-party pentobarbital suppliers, see id., Ex. D (Vaughn Index) at 4, 6–9 (emphasis added).  Although perhaps the likelihood of revealing personal information through these files is more attenuated, considering that they contain information that "could lead to [certain] identities," id., Ex. D (Vaughn Index) at 4, 6–9 (emphasis added), the Court nonetheless concludes that records 9, 13, and 15 can also be properly categorized as "similar files" because at least some of the redacted portions of the files contain "bits of personal information[,]" Jud. Watch, Inc., 449 F.3d at 152.  See, e.g., Christenson Decl., Ex. D (Vaughn Index) at 4, 6–8 (listing "identifying and contact information" for Bureau staff and third-party suppliers as part of the files' contents).

In contrast, the description of record 16 does not identify any actual personal information contained in the file.  Instead, the Vaughn Index describes this file as being redacted to the extent that it contains "[c]ost information, which could reveal the number of individuals traveling from a specific location."  Id., Ex. D (Vaughn Index) at 9 (emphasis added).  Although "[t]he information in the file 'need not be intimate' for the file to satisfy the standard," Milton, 783 F. Supp. 2d at 58 (internal citation omitted), "[i]nformation unrelated to any particular person presumably would not satisfy the threshold test[,]" Wash. Post Co., 456 U.S. at 602 n.4 (emphasis added).  Here, record 16 appears to only contain aggregate personnel costs which the Bureau states "could reveal the number of individuals traveling from a specific location."

Christenson Decl., Ex. D (<u>Vaughn</u> Index) at 9.  However, the Court need not address the issue of whether record 16 constitutes a "similar file" because "the Supreme Court has embraced the legislative history [of the FOIA] stating that 'the balancing of private against public interests, not the nature of the files in which the information was contained, should limit the scope of the exemption.'"  <u>Nat'l Ass'n of Home Builders v. Norton</u>, 309 F.3d 26, 33 (D.C. Cir. 2002) (quoting <u>Wash. Post Co.</u>, 456 U.S. at 599); <u>see</u> <u>id.</u> ("Accordingly, we turn to th[e balancing of privacy and public] interests, assuming without deciding that the requested [ ] records are 'similar files' under Exemption 6.").  Therefore, concluding that records 1–10, 12–13, 15, and 17–19 constitute "personal, medical or similar files[,]" <u>Houser</u>, 486 F. Supp. 3d at 115, and assuming without deciding that record 16 qualifies as a "similar file[,]" <u>id.</u>; <u>see</u> <u>Nat'l Ass'n of Home Builders</u>, 309 F.3d at 33, the Court will next consider whether the privacy interests implicated outweigh the public interest in disclosure.

## 2.  Whether Privacy Interests Outweigh the Public Interest in Disclosure

Having addressed the threshold issue of whether the withheld records constitute "personal, medical or similar files[,]" <u>Houser</u>, 486 F. Supp. 3d at 115, the Court must next determine whether disclosure of the information "would constitute a 'clearly unwarranted invasion of personal privacy[,]'" <u>Multi Ag. Media LLC</u>, 515 F.3d at 1228 (quoting 5 U.S.C. § 552(b)(6)), by "balanc[ing] the privacy interest that would be compromised by disclosure against any public interest in the requested information[,]" <u>id.</u> (citations omitted).  Specifically, the Court must determine whether disclosure "'would compromise a substantial, as opposed to <u>de minimis</u>, privacy interest,' because '[i]f no significant privacy interest is implicated . . . FOIA demands disclosure.'"  <u>Id.</u> at 1229 (quoting <u>Nat'l Ass'n of Retired Fed. Emps. v. Horner</u>, 879 F.2d 873, 874 (D.C. Cir. 1989)).  However, "[this] standard 'means less than it might seem,' as a

substantial privacy interest is 'anything greater than a <u>de minimis</u> privacy interest.'" <u>Ctr. for</u>

<u>Med. Progress v. U.S. Dep't of Health and Human Servs.</u>, No. 21-cv-642 (BAH), 2022 WL

4016617, at *12 (D.D.C. Sept. 3, 2022) (quoting <u>Multi Ag. Media LLC</u>, 515 F.3d at 1229–30).

 First, records 1–7, which contain COVID-19-related material, clearly implicate a

substantial privacy interest because individual medical information not only is explicitly

protected from disclosure in the statutory text of Exemption 6, <u>see</u> 5 U.S.C. ¶ 552(b)(6)

(exempting "medical files"), but also falls squarely within a category of information which

"encompass[es] the individual's control of information concerning his or her person[,]" <u>U.S.</u>

<u>Dep't of Just. v. Reporters Comm. for Freedom of Press</u>, 489 U.S. 749, 763 (1989).  As to the

remaining records withheld pursuant to Exemption 6, which relate to the federal execution

process, the defendant argues that "revealing the identities of individuals associated with the

process would reveal highly sensitive information—that those individuals participated in the

federal execution process."  Def.'s Mem. at 19 (citing Christenson Decl. ¶¶ 45, 47–48).  The

defendant states that "[Bureau] employees have faced violence due to their work for [the

Bureau]" and "[t]hese concerns are heightened in the context of involvement in the federal

execution process, a highly polarizing topic that has spurred harassment and threats."  <u>Id.</u> at 20

(citing Christenson Decl. ¶ 46). In response, the plaintiffs argue that the defendant's

representations amount to "doomsday scenarios for such an individual in the unlikely event of

their identification," which rely on "sensational media coverage of prisoners who have killed

corrections officers in contexts wholly unrelated to executions."  Pls.' Reply at 18.  Furthermore,

the plaintiffs argue that "[the d]efendant's attempts to diminish the public interest in the federal

government's  execution practices also fail[,]" <u>id.</u> at 19, because "the withheld information

relates to artificial entities with no legitimate privacy interest[,]" <u>id.</u> at 20.

"In construing Exemption 6, the D.C. Circuit has repeatedly found a substantial privacy interest in personal information that could subject individuals to 'injury and embarrassment.'" Ctr. for Med. Progress, 2022 WL 4016617, at *13 (quoting Jud. Watch, Inc., 449 F.3d at 153). Furthermore, "[a] threat of harassment is more than de minimis, and therefore substantial, if the 'risk' of harassment is both 'justified and articulable.'" Id. (quoting Jud. Watch, Inc., 875 F. Supp. 2d at 47). The defendant's declaration indicates that "the mission and nature of the work of these staff members render them vulnerable to harassment, threats[,] or attack[]" and "disclosure of the names and personal-contact information of these staff members would permit the targeting of individual employees, as well as potentially their families and friends outside the workplace." Christenson Decl. ¶ 45. Additionally, the defendant's declarant indicates that

> [d]isclosure of the names or other identifying information of third parties would reveal private information of persons who may be engaged in a highly-sensitive and emotionally-charged issue. . . . Similar to staff names, disclosing the job titles of third parties may allow these individuals to be identified based on their positions. Revealing this information would allow fellow officers, and owners, managers and employees of businesses, along with their friends and families, to be targeted, and would likely subject these individuals to embarrassment, harassment, threats or even assault.

Id. ¶ 47. Based upon this and other portions of the defendant's declaration, see id. ¶¶ 45, 47–48—factual assertions, which are "accepted as true" unless successfully rebutted, Wilson v. Dep't of Transp., 730 F. Supp. 2d 140, 148 (D.D.C. 2010)—the Court concludes that the defendant has articulated a "'risk' of harassment that is both 'justified and articulable[,]'" Ctr. for Med. Progress, 2022 WL 4016617, at *13 (quoting Jud. Watch, Inc., 875 F. Supp. 2d at 47). Furthermore, to the extent that the connection between the withheld information and the realization of this risk is somewhat attenuated, see Christenson Decl., Ex. D (Vaughn Index) at 4, 6–9 (stating that records 9, 13, and 15–16 were withheld because they contain "[i]dentifying information . . . that could lead to the identit[ies]" of Bureau Staff and/or third-party

pentobarbital suppliers (emphasis added)), "where 'a substantial probability that disclosure will cause an interference with personal privacy' exists, 'it matters not that there may be two or three links in the causal chain[,]'" Nat'l Ass'n of Home Builders, 309 F.3d at 34–35 (quoting Nat'l Ass'n of Retired Fed. Emps., 879 F.2d at 878).

Thus, records 8–10, 12–13, 15, and 17–19, which the defendant claims either contain direct identifying information or identifying information that could lead to discovery of staff and third-party identities, see Christenson Decl., Ex. D (Vaughn Index) at 3–10, present a "substantial probability that disclosure will cause an interference with personal privacy[,]" Nat'l Ass'n of Retired Fed. Emps., 879 F.2d at 878, even though records 9, 13, and 15 perhaps require additional "links in the causal chain[,]" id., between disclosure and ultimate identification and harassment.  As to record 16, however, "the problem is one of likelihood, not causation, for the [Bureau] has failed to show that [identification of individuals] is likely to occur[,]" Nat'l Ass'n of Home Builders, 309 F.3d at 35 (emphasis added), based upon this particular record.  The Court therefore agrees with the plaintiffs that an "[e]xpense report for personnel costs related to July/Aug[ust] 2020 executions[,]" Christenson Decl., Ex. D (Vaughn Index) at 9, which the defendant redacted to the extent that it contained "[c]ost information, which could reveal the number of individuals traveling from a specific location[,]" id., Ex. D (Vaughn Index) at 9, would arguably not be likely to lead to the identification of individuals, sufficient that disclosure "would constitute a clearly unwarranted invasion of privacy[,]" 5 U.S.C. § 552(b)(6) (emphasis added).  See Pls.' Reply at 17 ("[The Bureau] does not explain how expense totals for each institution could reveal even the number of staff participating, much less how a hypothetical investigator, equipped only with the number of staff who participated, would gain sufficiently proximate access to each institution and its staff to deduce who among them participated through

a 'process of elimination.'"); <u>Dep't of the Air Force v. Rose</u>, 425 U.S. 352, 380 n.19 (1976)

("The legislative history is clear that Exemption 6 was directed at threats to privacy more

palpable than mere possibilities.").  Therefore, the Court concludes that the disclosure of records

1–10, 12–13, 15, and 17–19—but not record 16—"would compromise a substantial, as opposed

to <u>de minimis</u>, privacy interest," <u>Nat'l Ass'n of Retired Fed. Emps.</u>, 879 F.2d at 874, based upon

either the disclosure of individual health information, which applies to records 1–7, or

information the disclosure of which would pose a "justified and articulable[,]" <u>Jud. Watch, Inc.</u>,

875 F. Supp. 2d at 47, threat of harassment or a consequence even worse, which applies to

records 8–10, 12–13, 15, and 17–19.[10]

  Finally, the Court concludes that the privacy interests implicated by disclosure of records

1–10, 12–13, 15, and 17–19 outweigh the public interest in disclosure.  The "basic purpose of

[the FOIA] . . . focuses on citizens' right to be informed about 'what their government is up

to[,]'" <u>Multi Ag. Media</u>, 515 F.3d at 1231, and "'a significant public interest in disclosure' exists

for records that 'will enable the public to more easily monitor whether [an] agency is carrying

out its statutory duty[,]'" <u>Ctr. for Med. Progress</u>, 2022 WL 4016617, at *14 (quoting <u>Multi Ag.

Media</u>, 515 F.3d at 1232).  However, where "there is a substantial privacy interest in the

requested identifying information due to the personal security risks that disclosure poses[,]"

<u>Stotter v. U.S. Agency for Int'l Dev.</u>, No. 14-cv-2156 (KBJ), 2020 WL 5878033, at *9 (D.D.C.

Oct. 3, 2020), this will likely outweigh a public interest in disclosure, especially where "the

unredacted information that [the agency] has released already details the agency's operations and

activities[,]" <u>id.</u> at *8, relevant to the plaintiffs' request.  Although the Court recognizes the

significant public "interest in how [the Bureau] spends taxpayer money and performs its duties[,]

---

[10] Although the Court concludes that record 16 was not properly withheld pursuant to Exemption 6, it does conclude
that it was properly withheld pursuant to Exemptions 7(C) and 7(F).  <u>See</u> <u>infra</u> Sections III.C.2, III.C.4.

. . . in the context of the [federal executions] during a global pandemic[,]" Pls.' Mem. at 38, the Court concludes that "the strong privacy interests the affected individuals have in 'avoiding physical danger' and harassment . . . clearly outweigh the [ ] public benefit, if any, that can be gained from revealing their identities[,]" Ctr. for Med. Progress, 2022 WL 4016617, at *15 (quoting Judicial Watch, Inc., 449 F.3d at 153).   Furthermore, the Court agrees with the defendant that "any interest by [the p]laintiffs in what their government is up to has largely been met by the hundreds of pages of documents released by [the Bureau,]" including "extensive records detailing [the Bureau's] expenditures in service of federal executions, travel costs, the number of [Bureau] employees staffed at the Incident Command Center during executions, and [the Bureau's] response to COVID-19[.]"   Def.'s Opp'n at 28; see Stotter, 2020 WL 5878033, at *8 (finding that the private interest outweighed the public interest where "the unredacted information that [the agency] ha[d] released already detail[ed] the agency's operations and activities").   Accordingly, the Court concludes that, except for record 16, the Bureau has properly withheld records 1–10, 12–13, 15, and 17–19 pursuant to Exemption 6.

**C.    Exemption 7**

Exemption 7 prohibits the disclosure of

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could

reasonably be expected to risk circumvention of the law, or (F) could reasonably
be expected to endanger the life or physical safety of any individual[.]

5 U.S.C. § 552(b)(7).  Therefore, "Exemption 7 protects from disclosure 'records or information

compiled for law enforcement purposes,' but only to the extent that disclosure of such records

would cause [one of Exemption 7's] enumerated harm[s.]"  Lewis v. U.S. Dep't of Just., 867 F.

Supp. 2d 1, 18 (D.D.C. 2011) (Walton, J.) (quoting 5 U.S.C. § 552(b)(7)).  Here, the defendant

has withheld records 1–10, 12–13, and 15–19 pursuant to Exemption 7(C); records 8, 10, 15, 17,

and 19 pursuant to 7(E); and records 8–10 and 13–19 pursuant to 7(F).  See generally

Christenson Decl., Ex. D (Vaughn Index).  Accordingly, the Court begins its analysis by

addressing whether the defendant has adequately demonstrated that the requested records were

"compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), and if so, then will turn to the

question of whether the defendant has demonstrated that "the production of such law

enforcement records[,]" id., would result in any of Exemption 7's "enumerated harm[s,]" Lewis,

867 F. Supp. 2d at 18.

### 1.  Whether the Documents Were "Compiled for Law Enforcement Purposes"

"To fall within FOIA Exemption 7, 'documents must first meet a threshold requirement:

that the records were 'compiled for law enforcement purposes."  Elec. Privacy Info. Ctr.

("EPIC") v. U.S. Dep't of Homeland Sec., 777 F.3d 518, 522 (D.C. Cir. 2015) (quoting Pub.

Emps. for Envtl. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, 740 F.3d 195, 202–03

(D.C. Cir. 2014)) (internal quotations omitted).  "[T]he term 'compiled' in Exemption 7 requires

that a document be created, gathered, or used by an agency for law enforcement purposes at

some time before the agency invokes the exemption."  Pub. Emps. for Env't Resp., 740 F.3d at

203.  Furthermore, "[l]aw enforcement entails more than just investigating and prosecuting

individuals after a violation of the law," id. (emphasis in original), but also "fairly includes . . .

the detection and <u>punishment</u> of violations of law[,]" <u>Mittleman v. Off. of Pers. Mgmt.</u>, 76 F.3d 1240, 1243 (D.C. Cir. 1993) (internal quotations and citations omitted) (emphasis added), as well as proactive steps taken to "prevent criminal activity and to maintain security[,]" <u>100Reporters v. U.S. Dep't of State</u>, No. 19-cv-1753 (RDM), 2022 WL 1223709, at *23 (D.D.C. Apr. 26, 2022) (quoting <u>Sack v. U.S. Dep't of Def.</u>, 823 F.3d 687, 694 (D.C. Cir. 2016)).  And,

> [w]ith respect to the threshold requirement of showing that the disputed records were compiled for law enforcement purposes, courts "are more deferential to the agency's claimed purpose for the particular records" when "the agency's principal function is law enforcement," and will "scrutinize with some skepticism the particular purpose claimed" when "the agency has mixed law enforcement and administrative functions."

<u>Codrea v. Bureau of Alcohol, Tobacco, Firearms & Explosives</u>, 239 F. Supp. 3d 128, 132 (D.D.C. 2017) (quoting <u>Pub. Emps. for Env't Resp.</u>, 740 F.3d at 203).

Here, the Bureau of Prisons "'is a law enforcement agency [entitled to] deference' on its claims of law enforcement purpose."  <u>Pinson v. Dep't of Just.</u>, 236 F. Supp. 3d 338, 365 (D.D.C. 2017) (quoting <u>Pinson v. U.S. Dep't of Just.</u>, 202 F. Supp. 3d 86, 101 (D.D.C. 2016)). Furthermore, the records at issue—"all of which address either the [Bureau's] response to COVID-19 at FCC Terre Haute or [the Bureau's] implementation of federal executions," Christenson Decl. ¶ 53—were all either compiled as part of the Bureau's "law enforcement mission of protecting inmates, staff, and the community[,]" <u>id.</u> (internal quotations omitted); <u>see</u> Christenson Decl. ¶ 53, or as part of its execution process, "[t]he effectuation of [which] is unquestionably a punishment for violating the law[,]" <u>CREW</u>, 567 F. Supp. 3d at 215. Therefore, although the plaintiffs argue that many of the records are tangential to the defendant's prison management and execution-related activities and responsibilities, <u>see</u> Pls.' Mem. at 29–31, considering the significant deference accorded to the Bureau as a law enforcement agency, <u>see</u> <u>Pinson</u>, 236 F. Supp. 3d at 365, the Court concludes for the following reasons that

these two categories of records were "compiled for law enforcement purposes[,]" 5 U.S.C. §

552(b)(7).

First, records 1–7 all relate to the Bureau's COVID-19 responses, see Christenson Decl.,

Ex. D (Vaughn Index) at 1–3 (describing records 1–7 as concerning "COVID-19 testing" and

"[c]ontact [t]racing" for COVID-19), which falls squarely within the Bureau's responsibility for

"the custody and care of inmates FCC Terre Haute[,]" Christenson Decl. ¶ 53, a responsibility

which has been accepted by one of the Court's colleagues as a valid law enforcement purpose,

see, e.g., Pinson v. Dep't of Just., 313 F. Supp. 3d 88, 114 (D.D.C. 2018) (finding that records

"pertain[ing] to how [the Bureau] . . . monitors and maintains the health and safety of its inmates

and staff . . . were compiled for law enforcement purposes"); Mingo v. U.S. Dep't of Just., 793

F. Supp. 2d 447, 453 (D.D.C. 2011) (finding records associated with an altercation between

inmates were compiled for law enforcement because they were "created in connection with the

[the Bureau's] responsibility to 'protect[] inmates, staff, and the community'").  Therefore, the

Court concludes that records 1–7 were compiled for law enforcement purposes because they

pertain to the Bureau's "monitor[ing] and maint[enance of] the health and safety of its inmates

and staff[,]" Pinson, 313 F. Supp. 3d at 114.

Second, records 8–10 and 12–19 all pertain in some way to the Bureau's administration

of the execution process.  See Christenson Decl., Ex. D (Vaughn Index) at 3–10 (describing

records 8–10 and 12–19 as, e.g., "[t]racking report for expenses relating to [execution of the]

death penalty[,]"  "[c]ontracts . . . for purchase of pentobarbital[,]" "[o]bligation and [p]ayment

[r]eports for expenses incurred . . . relating to the death penalty[,]" "[c]onstruction blueprints for

[the] execution facility[,]" and other documents tangential to the administration of the execution

process).  Records created in conjunction with actions undertaken "as part of [the Bureau's]

mandate to implement[] federal death sentences[,]" CREW, 567 F. Supp. 3d at 215, are compiled for law enforcement purposes because "[t]he effectuation of the death penalty is unquestionably a punishment for violating the law[,]" id., and therefore encompassed by the term "law enforcement," see Mittleman, 76 F.3d at 1243 ("[E]nforcement of the law fairly includes . . . the detection and punishment of violations of law[.]"). Therefore, the Court concludes that records 8–10 and 12–19 were compiled for law enforcement purposes because they pertain to "[the Bureau's] implementation of federal executions[.]" Christenson Decl. ¶ 53. Having concluded that the withheld records were "compiled for law enforcement purposes[,]" 5 U.S.C. ¶ 552(b)(7), the Court will next turn to the specific exemptions claimed by the defendant under Exemption 7.

## 2. Exemption 7(C)

Exemption 7(C) protects from disclosure information in law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The application of this exemption is similar to that of Exemption 6, see supra Section III.B, as "[b]oth exemptions require agencies and reviewing courts to 'balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information.'" 100Reporters LLC v. U.S. Dep't of Just., 248 F. Supp. 3d 115, 158 (D.D.C. 2017) (quoting Beck v. U.S. Dep't of Just., 997 F.2d 1489, 1491 (D.C. Cir. 1993)). However, there are two important differences between the two exemptions. First, "Exemption 7 in general applies only to information compiled for 'law enforcement purposes.'" Stonehill v. Internal Revenue Serv., 534 F. Supp. 2d 1, 11 (D.D.C. 2008). Second, "Exemption 7(C) . . . establishes a lower bar for withholding material," Prison Legal News v. Samuels, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (quoting Am. C.L. Union v. U.S. Dep't of Just., 655 F.3d 1, 6 (D.C. Cir. 2011)), because, "while Exemption 6 requires a 'clearly

unwarranted invasion of personal privacy' to qualify for withholding, Exemption 7(C) requires

only that disclosure 'could reasonably be expected to constitute an unwarranted invasion of

personal privacy,'" Stonehill, 534 F. Supp. 2d at 11 (quoting 5 U.S.C. § 552(b)(6)–(7)).

Therefore, because Exemption 6 imposes a higher bar, records properly withheld pursuant to

Exemption 6 are necessarily properly withheld pursuant to Exemption 7(C).  See Archibald v.

U.S. Dep't of Just., 950 F. Supp. 2d 80, 86 (D.D.C. 2013) (Walton, J.) ("[T]he language of the

two exemptions is similar, with Exemption 7(C) providing 'somewhat broader' privacy

protection." (quoting Reporters Comm. for Freedom of Press, 489 U.S. at 756)); Reporters

Comm. for Freedom of Press, 489 U.S. at 756 (noting and finding significant the absence of the

adverb "clearly" from, and the addition of the phrase "could reasonably be expected" to,

Exemption 7(C)).

> Here, the defendant applies Exemption 6 and 7(C) to the same set of withholdings.  See
> Christenson Decl., Ex. D (Vaughn Index) at 1–10 (applying Exemptions 6 and 7(C) to records
> 1–10, 12–13, and 15–19).  Having previously concluded that all of these records meet the
> threshold requirement of being "compiled for law enforcement purposes[,]" 5 U.S.C. §
> 552(b)(7); see supra Section III.C.1, the Court must now determine whether these records "could
> reasonably be expected to constitute an unwarranted invasion of personal privacy[,]" 5 U.S.C.
> § 552(b)(7)(C).  Because the Court has already concluded that records 1–10, 12–13, 15, and 17–
> 19 were properly withheld under the narrower standard applicable to Exemption 6, it need not
> address whether the withholding of these records meets the broader standard imposed in the
> Exemption 7(C) context.  Cf. Archibald, 950 F. Supp. 2d at 86 (finding that the Court need not
> analyze both exemptions because "if the defendant[ is] not excused from disclosure under the
> [broader] privacy protection of Exemption 7(C), then neither will they be excused under

Exemption 6"). However, because the Court found that record 16 was not properly withheld

pursuant to Exemption 6, see supra Section III.B, it must now address whether this record is

protected from disclosure under the lower standard imposed pursuant to Exemption 7(C).

The defendant describes the redacted portion of record 16 as "[c]ost information, which

could reveal the number of individuals traveling from a specific location" and applies Exemption

7(C) for what it characterizes as "[i]nformation that could lead to the identity of [Bureau] staff."

Christenson Decl., Ex. D (Vaughn Index) at 9. As part of its briefing regarding the plaintiffs'

motion to strike, see Plaintiffs' Motion to Strike Declaration of Kara Christenson (ECF No. 38-4)

("Pls.' Mot. to Strike"), ECF No. 44, the defendant filed a supplemental declaration, which states

that

> [t]he redacted information could reveal the number of individuals traveling from
> each specific location, and thus the number of staff from each of the institutions
> participating in the executions. Because the number of staff participating from
> each institution is low, revealing the number of staff involved from each
> institution would permit identification of the specific individuals by process of
> elimination or investigation.

Defendant's Opposition to Plaintiffs' Motion to Strike Declaration of Kara Christenson ("Def.'s

Strike Opp'n"), Ex. A (Supplemental Declaration of Kara Christenson ("Suppl. Christenson

Decl.")) ¶ 14, ECF No. 48-1. And, it is this dual request—the number of personnel associated

with specific facilities—that makes the identification of specific individuals possible. See id.,

Ex. A (Suppl. Christenson Decl.) ¶ 14. "[A]ccept[ing] as true" unrebutted factual assertions

made by the defendant in its declarations, Wilson, 730 F. Supp. 2d at 148, the Court concludes

that although record 16 may not rise to the level of "a clearly unwarranted invasion of personal

privacy[,]" 5 U.S.C. § 552(b)(6) (emphasis added), it "could reasonably be expected to constitute

an unwarranted invasion of personal privacy[,]" 5 U.S.C. § 552(b)(7)(C) (emphasis added). See

Reporters Comm. for Freedom of Press, 489 U.S. at 756 (noting and finding significant the

absence of the adverb "clearly" from, and the addition of the phrase "could reasonably be expected" to, Exemption 7(C)).  Thus, in the Exemption 6 context, although record 16 may not create "a substantial probability that disclosure will cause an interference with personal privacy[,]" Nat'l Ass'n of Retired Fed. Emps., 879 F.2d at 878, in the Exemption 7(C) context, it can be "reasonably expected[,]" 5 U.S.C. § 552(b)(7)(C), based upon the defendant's representations, that staff identities could be ascertained from these records—even though doing so would require close investigation.  Compare cf. McDonnell Douglas Corp. v. U.S. Dep't of Air Force, 375 F.3d 1182, 1191–92 (D.C. Cir. 2004) (affirming the release of data where there was neither a viable theory nor evidence supporting the defendant's claim that release would enable a third party to calculate protected information), with Def.'s Strike Mot., Ex. A (Suppl. Christenson Decl.) ¶ 14 ("Because the number of staff participating from each institution is low, revealing the number of staff involved from each institution would permit identification of the specific individuals by process of elimination or investigation.").

The Court therefore concludes that this articulated risk amounts to significantly more than "bare speculation[,]" WP Co. LLC v. U.S. Small Bus. Admin., No. 20-cv-1240 (JEB), 2020 WL 6504534, at *16 (D.D.C. Nov. 5, 2020), and gives rise to the reasonable expectation required by Exemption 7(C).  Furthermore, for the same reasons articulated in the context of the application of Exemption 6, see supra Section III.B.2, the privacy interests implicated by disclosure of record 16 outweighs the public interest in disclosure.  Accordingly, the Court concludes that the defendant properly withheld records 1–10, 12–13, and 15–19 pursuant to Exemption 7(C).

3. **Exemption 7(E)**

Exemption 7(E) protects from disclosure information in law enforcement records, the

release of which

> would disclose techniques and procedures for law enforcement investigations or
> prosecutions, or would disclose guidelines for law enforcement investigations or
> prosecutions[,] if such disclosure could reasonably be expected to risk
> circumvention of the law[.]

5 U.S.C. § 552(b)(7)(E).  This exemption "sets a relatively low bar for the agency to justify

withholding[,]" Blackwell v. Fed. Bureau of Investigation, 646 F.3d 37, 42 (D.C. Cir. 2011),

specifically, "'[r]ather than requiring a highly specific burden of showing how the law will be

circumvented, [E]xemption 7(E) only requires that the [agency] demonstrate logically how the

release of the requested information might create a risk of circumvention of the law[,]'" id.

(second alteration in original) (quoting Mayer Brown LLP v. Internal Revenue Serv., 562 F.3d

1190, 1194 (D.C. Cir. 2009)).

Here, the defendant has withheld records 8, 10, 15, 17, and 19 pursuant to Exemption

7(E).  See Christenson Decl., Ex. D (Vaughn Index) at 3–5, 7–10.  All of these records concern

the federal execution process and were withheld or redacted in order to protect the "[i]dentity of

[h]otel(s) from whom rooms were reserved for overnight lodging of [Bureau] staff, contractors,

and witnesses," id., Ex. D (Vaughn Index) at 4–5 (records 8 and 10), in addition to

> [i]dentifying information . . .  contained in the invoices from suppliers . . . that
> could lead to the identity of individuals and/or companies from whom the federal
> government procured or contemplated procuring [p]entobarbital or related critical
> services[, i]dentifying information of [Bureau] staff involved in procurement of
> lethal    injection    substances[,    and    i]dentifying    information    of
> individuals/companies providing critical services related to the carrying out of a
> federal execution[,]

id., Ex. D (Vaughn Index) at 8 (record 15); "[o]peration and check-in time periods," id., Ex. D

(Vaughn Index) at 9 (record 17); and the "[n]umber and type of weapons deployed/authorized to

be used by external security and support staff related to federal executions[,]" id., Ex. D (Vaughn Index) at 10 (record 19).  The defendant states through its declarant that "Exemption 7(E) was applied to withhold information describing the guidelines, techniques[,] and procedures used to effectively prepare for and carry out a federal execution[,]" Christenson Decl. ¶ 75, and specifically, "was applied to information contained in records . . . that would reveal specific law enforcement techniques and strategies to prepare for and implement a federal execution, as well as expose [the Bureau's] capabilities and vulnerabilities in responding to emergencies or unrest related to carrying out a federal execution[,]" id. ¶ 76.  Having previously concluded that all of these records meet the threshold requirement of being "compiled for law enforcement purposes[,]" 5 U.S.C. § 552(b)(7); see supra Section III.C.1, the Court must now determine (1) whether the withholdings constitute information related to "techniques and procedures[,]" 5 U.S.C. § 552(b)(7)(E); (2) whether they relate to "law enforcement investigations or prosecutions[,]" id.; and (3) whether "disclosure could reasonably be expected to risk circumvention of the law[,]" id.

First, the defendant's statement in its declaration that the information withheld "describ[es] the guidelines, techniques and procedures used[,]" Christenson Decl. ¶ 75, in the federal execution process context make it "facially clear that the withheld records satisfy this first part of the exemption—that they be 'techniques and procedures[,]'" CREW, 567 F. Supp. 3d at 215 (finding that the withheld information constitutes "techniques and procedures" where the defendant represented that the exemption was applied to withhold "the guidelines, techniques, and procedures used to obtain [p]entobarbital" (internal citation omitted)).  However, "these 'techniques and procedures' . . . have nothing to do with 'law enforcement investigations or prosecutions.'"  Id.

Although the administration of punishment—and therefore, the federal execution process—falls within the broader category of "law enforcement purposes" as part of Exemption 7's threshold inquiry, see Mittleman, 76 F.3d at 1243 (concluding that the category of "law enforcement purposes" "fairly includes . . . the detection and punishment of violations of law"), it does not necessarily fall within the specific sub-categories of "investigations or prosecutions" covered by Exemption 7(E), 5 U.S.C. § 552(b)(7)(E); see CREW, 567 F. Supp. 3d at 217 ("The plain meaning of . . . Exemption 7(E) covers the investigation and prosecution phases of the criminal process but not the punishment phase.").  The records withheld here, and the defendant's explanations for their withholdings pursuant to Exemption 7(E), do not identify any investigatory or prosecutorial function.  See generally Christenson Decl. ¶¶ 75–76.  Although internal Bureau procedures have been deemed properly withheld pursuant to Exemption 7(E), these records have generally pertained to the internal policing of inmates.  See, e.g., Pinson, 313 F. Supp. 3d at 117–18 (finding application of Exemption 7(E) appropriate where the withheld records concerned "equipment to be used during the use of force technique, which staff members were to perform what role during the use of force, and steps to be taken if the inmate remained noncompliant[;]" "techniques for investigating criminal activity within a prison facility [and] factual information developed using these underlying techniques[;]" and "investigative reports from an intelligence database used by [Bureau] staff during law enforcement investigations"); Harrison v. Fed. Bureau of Prisons, 611 F. Supp. 2d 54, 66–67 (D.D.C. 2009) (finding application of Exemption 7(E) appropriate to withhold records indicating when and why an investigator chose to investigate and listen to a prisoner's telephone conversations); Allen v. Fed. Bureau of Prisons, No. 16-cv-708 (CKK), 2019 WL 498804, at *7 (D.D.C. Feb. 8, 2019) (finding application of Exemption 7(E) appropriate to withhold information regarding

investigative and interview techniques applied to inmates because "[i]nvestigative and interview techniques qualify for protection under Exemption 7(E)"); but see Pinson, 202 F. Supp. 3d at 96, 103–04 (finding that "two memoranda detailing Special Administrative Measures [ ] imposed on two different individuals in [Bureau] custody" were improperly withheld under Exemption 7(E) because the defendant "ha[d] not explained the nexus between any information contained in the memorand[a] and the possible disclosure of investigatory or prosecutorial techniques"). Furthermore, although internal safety procedures and responses may be protected from disclosure pursuant to Exemption 7(E), they must still involve some sort of investigatory function.  See, e.g., Pub. Emps. for Env't Resp., 740 F.3d at 205 (finding that an agency's emergency action plan was protected under Exemption 7(E) because it "describe[d] how law enforcement personnel might investigate the cause of a dam failure[,]" which "may constitute 'law enforcement investigations' when there is suspicion of criminal sabotage or terrorism").

Here, the records withheld by the defendant all pertain to the federal execution process, but do not on their face involve any investigatory or prosecutorial function, see Christenson Decl., Ex. D (Vaughn Index) at 3–5, 7–10, even though they concern internal emergency responses or safety protocol, see id., Ex. D (Vaughn Index) at 10 (withholding the "[n]umber and type of weapons deployed/authorized to be used by external security and support staff related to federal executions").  Furthermore, the defendant has failed to establish any clear nexus between these records and an investigatory or prosecutorial function, instead stating that disclosure of the records would "reveal specific law enforcement techniques and strategies to prepare for and implement a federal execution, as well as expose [the Bureau's] capabilities and vulnerabilities in responding to emergencies or unrest related to carrying out a federal execution."  Christenson Decl. ¶ 76; see id. ("If disclosed, this information is reasonably likely to interfere with [the

Bureau's] ability to respond effectively to emergencies that arise during federal executions and could interrupt and usurp [the Bureau's] legal mandate to carry out the death penalty.").  Thus, although the defendant describes the potential effects that could result from disclosure, it does not establish how these records are investigatory or prosecutorial in nature.  See CREW, 567 F. Supp. 3d at 216–17 ("The [defendant] fails to grapple with the text of the statute and focuses instead on whether disclosure creates a 'risk of circumvention of the law,' and whether the procedures were described with sufficient specificity[.]" (internal citations omitted)); see also id. at 215–16 (applying common usage of the terms "investigation" and "prosecution," and collecting cases).  Therefore, because the techniques and procedures described by the defendant "have nothing to do with 'law enforcement investigations or prosecutions[,]'" id. at 215, the Court concludes that the defendant improperly withheld these documents pursuant to Exemption 7(E).[11]

### 4.  Exemption 7(F)

The Court now turns to Exemption 7(F), which authorizes the withholding of information compiled for law enforcement purposes that "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).  "Unlike Exemption 7(C), which involves a balancing test, Exemption 7(F) 'is an absolute ban against [the] disclosure of certain information[,]'" Pinson, 236 F. Supp. 3d at 368 (citations omitted) (quoting Raulerson v. Ashcroft, 271 F. Supp. 2d 17, 29 (D.D.C. 2002)), and, "'within limits, courts defer to the agency's assessment of danger,'" id. (quoting Sanchez-Alaniz v. Fed. Bureau of Prisons, No. 13-

---

[11] Because the Court has concluded that the defendant has failed to show that these records do not pertain to "law enforcement investigations or prosecutions[,]" 5 U.S.C. § 552(b)(7)(E), within the meaning of Exemption 7(E), it need not reach the last inquiry in the Exemption 7(E) context, namely, whether "disclosure could reasonably be expected to risk circumvention of the law[,]" id.  See CREW, 567 F. Supp. 3d at 217 (finding withholdings under Exemption 7(E) improper without reaching the inquiry regarding whether "disclosure [could reasonably be expected to] risk circumvention of the law").

cv-1812 (EGS), 2016 WL 1222214, at *7 (D.D.C. Mar. 28, 2016)).  Exemption 7(F)'s "language is very broad" and "does not require that a particular kind of individual be at risk of harm;" rather, "'any individual' will do."  Pub. Emps. for Env't Resp., 740 F.3d at 205.  "Moreover, '[d]isclosure need not definitely endanger life or physical safety; a reasonable expectation of endangerment suffices.'"  Pinson, 236 F. Supp. 3d at 368 (quoting Pub. Emps. for Env't Resp., 740 F.3d at 205) (alteration in original) (emphasis in original).  Rather, "Exemption 7(F) does not require concrete evidence in every case."  Pub. Emps. for Env't Resp., 740 F.3d at 206.  "The terms 'could' and 'expected' in Exemption 7(F) evince congressional understanding of the many potential threats posed by the release of sensitive agency information[,]" and "[a]n agency therefore need only demonstrate that it reasonably estimated that sensitive information could be misused for nefarious ends."  Id.

Here, the defendant has withheld records 8–10 and 13–19 pursuant to Exemption 7(F). See Christenson Decl., Ex. D (Vaughn Index) at 3–10.  Specifically, the defendant has withheld: (1) the same information it withheld under Exemptions 6 and 7(C), including "identifying information . . . that could reveal the identity of individuals involved in the federal execution process, or of individuals or companies involved in the procurement of pentobarbital or related critical services," Def.'s Mem. at 21; see Christenson Decl. ¶ 83; id., Ex. D (Vaughn Index) at 4–5, 7–10 (records 9–10, 13, and 15–19); (2) "the names of hotels where rooms were reserved for [Bureau] staff, contractors, and witnesses associated with federal executions[,]" Def.'s Mem. at 21; see Christenson Decl. ¶ 87; id., Ex. D (Vaughn Index) at 4–5 (records 8 and 10); and (3) "blueprints of the execution facility[,]" Def.'s Mem. at 22; see Christenson Decl. ¶ 82; id., Ex. D (Vaughn Index) at 7 (record 14).

First, regarding the defendant's withholdings of records containing identifying information, the Court concludes that these records were properly withheld.  Generally, Exemption 7(F) "has been interpreted to apply to names and identifying information of law enforcement officers, witnesses, confidential informants and other third persons who may be unknown to the requester[,]" and has also been properly applied by the Bureau "to protect information concerning inmates, staff, and others[,]" which would "readily reveal the [individual's] identity."  Berard v. Fed. Bureau of Prisons, 209 F. Supp. 3d 167, 174 (D.D.C. 2016).  Furthermore, the defendant has presented a viable "nexus between disclosure and possible harm[.]"  Antonelli v. Fed. Bureau of Prisons, 623 F. Supp. 2d 55, 58 (D.D.C. 2009).  Specifically, the defendant states that

> disclosure of the names, personal identifiers, contact information, and hotel accommodations of staff or third parties associated with implementing the death penalty could subject them to being targeted for harassment, threats[,] or assault. Specifically, the individuals whose identities would be disclosed could reasonably be expected to be subjected to retaliation, threats, and/or harassment by persons in the public including anti-death penalty advocates, or other actions at the direction or discretion of the inmates who have received a sentence of death.  While these inmates may be incarcerated, this does not mean that they are incapable of committing violent acts either directly against identified staff who may work in the prison in which they are housed, or at their direction by persons in the community.
> . . .
> [Furthermore, d]isclosure of individuals associated with the federal execution process could also reasonably be expected to subject the identified individuals to harassment or threats against their lives or physical safety by persons in the public, including anti-death penalty advocates.

Christenson Decl. ¶¶ 84–85 (internal citations omitted); see supra Sections III.B, III.C.2 (describing safety risks of disclosure in the context of Exemptions 6 and 7(C)).

Based on these representations, the Court also concludes that the defendant properly withheld "the names of hotels where rooms were reserved for [Bureau] staff, contractors, and witnesses associated with federal executions."  Def.'s Mem. at 21.  The defendant has articulated

"a reasonable expectation of endangerment[,]" Pub. Emps. for Env't Resp., 740 F.3d at 205, in

stating that "[i]dentifying these hotels could reasonably be expected to endanger individuals

associated with the execution process by 'providing an opportunity for ill-intentioned individuals

opposed to the death penalty to stake out a particular hotel' for purposes of harassment or other

nefarious acts[,]" Def.'s Mem. at 22 (quoting Christenson Decl. ¶ 87).  Thus, although the harm

that could result from this particular type of harassment is not entirely "definite[] [,]" Pub. Emps.

for Env't Resp., 740 F.3d at 205, or "concrete[,]" id. at 206, it also is not "unsupported

speculation[,]" Pls.' Mem. at 39 (quoting Long v. Dep't of Just., 450 F. Supp. 2d 42, 80 (D.D.C.

2006)).  Rather, "[t]he terms 'could' and 'expected' in Exemption 7(F)" indicate that the Bureau

"need only demonstrate that it reasonably estimated that sensitive information could be misused

for nefarious ends[,]" Pub. Emps. for Env't Resp., 740 F.3d at 206, which the Court concludes it

has done here.

Finally, the Court concludes that the defendant properly withheld "blueprints of the

execution facility[,]" Def.'s Mem. at 22, pursuant to Exemption 7(F).  "[I]n Exemption 7(F)

cases involving documents relating to critical infrastructure, 'it is not difficult to show that

disclosure may endanger the life or physical safety of any individual[,]'" Pub. Emps. for Env't

Resp., 740 F.3d at 205–06 (quoting Milner v. Dep't of the Navy, 562 U.S. 562, 582 (2011)

(Alito, J., concurring)) (internal quotations omitted), and "[t]herefore, assuming an agency has

met Exemption 7's threshold test, it will ordinarily be able to satisfy Exemption 7(F) for

documents relating to critical infrastructure, such as blueprints, maps, and emergency plans[,]"

id. at 206.  Here, the defendant states that

> [b]ecause of the nature of the blueprints and the level of detail included therein,
> releasing any portion of the blueprints of that facility provides opportunity to
> probe for vulnerabilities to breach security of the facility, for example by
> identifying locations for concealing individuals and/or contraband tools including

in or around the ventilation system thereby placing staff, inmates, outside law enforcement officers and witnesses, in both the Execution Facility and the entire Correctional Complex, in jeopardy and significant risk of harm.

Christenson Decl. ¶ 82.  Thus, the Court finds that the defendant has articulated a "nexus between disclosure and possible harm[,]" Antonelli, 623 F. Supp. 2d at 58, especially given the Circuit's regard for critical infrastructure information as inherently sensitive and clearly subject to the protections of Exemption 7(F), see Pub. Emps. for Env't Resp., 740 F.3d at 205–06. Accordingly, having "'defer[red] to the [Bureau's] assessment of danger[,]'" Pinson, 236 F. Supp. 3d at 368 (quoting Sanchez-Alaniz, 2016 WL 1222214, at *7), the Court concludes that the defendant properly withheld records 8–10 and 13–19 pursuant to Exemption 7(F).

**D.    Segregability**

Finally, the Court must address whether the Bureau provided the plaintiffs with all reasonably segregable information.  Under the FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  "[I]t has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."  Wilderness Soc'y v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 18 (D.D.C. 2004) (Walton, J.) (emphasis omitted).  Therefore, because "[t]he focus of the FOIA is information, not documents, [ ] an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."  Mead Data Ctr., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).  "A district court's determination that agency records are exempt from disclosure under the FOIA is subject to remand if the court does not also make specific findings on the question of segregability[,]" Jud. Watch, Inc. v. U.S. Dep't of Def., 245 F. Supp. 3d 19, 36 (D.D.C. 2017) (Walton, J.), "even if the requester did not raise the

issue of segregability before the [C]ourt[,]" Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1116 (D.C. Cir. 2007).

To accord the Court the ability to appropriately assess segregability, it "must be provided with a 'relatively detailed description' of the withheld material." Jud. Watch, Inc., 245 F. Supp. 3d at 36 (citing Krikorian v. U.S. Dep't of State, 984 F.2d 461, 467 (D.C. Cir. 1993)). To comply with this requirement, "[a]gencies must review the withheld documents and determine whether, absent the exempted material, the resulting document would still be comprehensible, or whether 'the result would be an essentially meaningless set of words and phrases.'" Id. at 36 (citing Mead Data Ctr., 566 F.2d at 261). "[T]o show that an entire document cannot be produced[,]" an agency must conduct "[a] 'document-by-document' review and [provide] a declaration that each piece of information that is withheld is not reasonably segregable[.]" Id. (citing Juarez v. U.S. Dep't of Just., 518 F.3d 54, 61 (D.C. Cir. 2008)).

Although "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material[,]" Ecological Rts. Found. v. U.S. Env't Protection Agency, 541 F. Supp. 3d 34, 66 (D.D.C. 2021) (quoting Sussman, 494 F.3d at 1117), an "agency must provide a 'detailed justification' for [the exempt material's] non-segregability[,]" id. (alterations in original) (quoting Johnson v. Exec. Off. for U.S. Att'ys, 310 F.3d 771, 776 (D.C. Cir. 2002)). "Affidavits attesting to the agency's 'line-by-line review of each document withheld in full' and the agency's determination 'that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions,' in conjunction with a Vaughn index describing the withheld record, suffice." Id. (quoting Johnson, 310 F.3d at 776).

The Court concludes that the Bureau has adequately demonstrated that it "disclose[d all] reasonably segregable material." Sussman, 494 F.3d at 1117. The Bureau represents that it

"conducted a page-by-page and line-by-line review of each responsive record to achieve maximum disclosure consistent with the access provisions of the FOIA and the FOIA statutory exemptions[,]" and "[e]very effort was made to provide [the plaintiffs] with all reasonably segregable, nonexempt information in the responsive records."  Christenson Decl. ¶ 21. Otherwise, "the [Bureau] withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information."  Id. ¶¶ 40, 49, 70, 73, 80, 88.  Based upon these representations, as well as its review of the Bureau's declarations and the Bureau's briefs, the Court agrees that the Bureau only withheld information that is exempt from disclosure or material "inextricably intertwined with exempt portions."  Mead Data Cent., Inc., 566 F.2d at 260; see Porup v. Cent. Intel. Agency, 997 F.3d 1224, 1239 (D.C. Cir. 2021) (concluding that "the [a]gency [ ] carried its burden in demonstrating that it released all segregable portions of the responsive documents" where it gave sworn statements that "attested that the [a]gency had 'conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information' within responsive records . . . [and it] determined that no additional information may be released without divulging information that [ ] falls within the scope of one or more FOIA exemptions" (internal citations omitted)).

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendant's motion for summary judgment, and grant in part and deny in part the plaintiffs' cross-motion for summary judgment.  The defendant's motion is granted with respect to the defendant's withholdings pursuant to Exemptions 4, 6, 7(C), and 7(F), and denied in all other respects.  The plaintiffs' motion is granted to the extent it seeks disclosure of the information withheld pursuant to Exemption 7(E), and denied in all other respects.

**SO ORDERED** this 28th day of November, 2022.[12]

REGGIE B. WALTON
United States District Judge

---

[12] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.